# United States Court of Appeals
## For the First Circuit

No. 06-1978

UNITED STATES OF AMERICA,

Appellee,

v.

NICHOLAS RHEAULT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,

and Gelpí,* District Judge.

Edward J. Juel for appellant.
David Hennessy, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

March 27, 2009

*Of the District of Puerto Rico, sitting by designation.

**HOWARD, <u>Circuit Judge</u>.** Appellant Nicholas Rheault ("Rheault") was charged with one count of conspiring to distribute ecstasy, three counts of possession of ecstacy with intent to distribute, and one count of being a felon in possession of a firearm.[1] Rheault moved to suppress the drugs and gun that formed the basis of the charges, claiming that they were discovered pursuant to a search that violated his Fourth Amendment rights. The district court denied the motion, and Rheault subsequently pled guilty to all five counts, conditioned on his right to appeal the denial of the suppression motion.[2] The court sentenced Rheault to 132 months in prison, followed by three years of supervised release. Rheault appeals from the denial of the motion to suppress and his sentence. We affirm.

## I. FACTUAL BACKGROUND

### A. The arrest and search

The facts essential to deciding this appeal are largely not in dispute. In late 2004 Donald Whitney met on several occasions with a drug purchaser to discuss the sale of ecstasy tablets. Unbeknownst to Whitney, the buyer was an undercover agent of the U.S. Drug Enforcement Agency ("DEA"). In connection with each sale, agents saw Whitney enter a three-decker at 122-124

---

[1] "Ecstacy" is the street name for the chemical compound 3,4-methylenedioxymethamphetimine.

[2] <u>See</u> Fed. R. Crim. P. 11(a)(2).

Middle Street in Leominster, Mass. -- later determined to be Rheault's residence -- and then proceed to meet the undercover agent to consummate the sale. On one occasion, Whitney mentioned that his supplier lived there. On another, agents saw Rheault circling the location in his car where the drug deal was taking place inside. Agents also observed Rheault watching a sale from a distance.

DEA agents arrested Whitney on February 1, 2005. He quickly agreed to cooperate with them. Following the agents' instructions, Whitney called Rheault several times to arrange a purchase of 200 ecstacy pills. Here the versions of events diverge slightly. At his change-of-plea hearing, Rheault denied that he agreed to this sale. The government claims to the contrary, and further states that Rheault told Whitney that he could not deliver the drugs until the following morning. Regardless, the agents did not want to delay Rheault's arrest. Accordingly, after procuring an arrest warrant they set off to apprehend him, forewarned by Whitney that Rheault carried a nine-millimeter handgun with a laser sight.

Upon their arrival at 122-124 Middle Street, agents tried to lure Rheault outside by having his car towed. That proved ineffective, so agents entered the building by a back stairway to Rheault's second-floor apartment. One of Rheault's two roommates, Alex Archambault, opened the apartment door and was greeted by

agents with drawn weapons. After restraining Archambault, determining that Rheault was not in the apartment, and hearing sounds from above, the agents asked for and received Archambault's key to a door that led to a different stairway. Agents went up to a third-floor landing, where they found Rheault attempting to hide behind a bookcase and took him into custody. In a disabled washing machine[3] about seven feet from Rheault's hiding spot, agents discovered a nine-millimeter pistol with a laser sight, a bag containing 44 ecstasy pills, ecstasy in powder form, cocaine and LSD.

B.  The apartment

Because the layout of 122-124 Middle Street is crucial to our inquiry, we recount the physical characteristics of the premises, based on testimony presented at the two-day suppression hearing.

As previously noted, 122-124 Middle Street was a three-story building. There was one apartment on each floor, and Rheault lived in the second-floor apartment. The front door of the building -- which was left unlocked -- opened to a landing that contained the mailboxes for the three apartments. From this landing, two doors were accessible. One door was to the apartment on the first floor; the other led to an interior stairway shared by

---

[3]  The machine was neither plugged in nor attached to a water source. It was not known whether it would have been operational if properly hooked up.

the second and third floor apartments ("the front stairway"). This interior stairway door had a lock accessed from the outside by a skeleton key[4], and a deadbolt lock that could only be accessed from the inside, in other words, only by tenants or other people already within the apartments on the second or third floor. There was conflicting testimony as to whether this deadbolt was usually locked. The landlord testified that the deadbolt was not supposed to be locked, while Rheault's roommate, Archambault, testified that it was almost always locked.[5] Both Rheault's apprehension and the discovery of the gun and drugs in the washing machine took place on the third floor landing of the front stairway.

The more accessible stairway was in the rear of the building. It served all three apartments and was not locked from the street. While tenants were permitted to use both stairways, the testimony suggested that tenants on the second and third floor relied almost exclusively on the rear stairway, as did delivery persons and guests. The two stairways were not connected. Thus, to get from the back stairway to the front stairway, it was

---

[4]  The landlord testified that he issued a key to one of Rheualt's roommates; the roommate testified that he never received one from the landlord, and had to have one made "from scratch." It was undisputed that Rheault did not have a key to the front stairway door.

[5]  The district court did not resolve this conflict. Instead, the court assumed, without deciding, that the door was locked "all or substantially all of the time."

necessary to go through the second or third-floor apartment, as the officers did when they sought to arrest Rheault.

The landlord testified that he occasionally used the front stairway to allow, for example, cable television personnel access to the basement. He also testified that tenants were not permitted to use the front stairway and landings for storage, as such use would create a fire hazard.[6] Instead, each apartment had its own storage area, which was large enough for a washing machine or bookshelf. On occasion, he had asked tenants to remove stored items from the front stairway landings.

The landlord testified that, although he had asked the third-floor tenants to remove the washing machine from the third-floor landing about a month prior to Rheault's arrest, they had not done so. Moreover, additional items had been placed there, including tables, chairs, a damaged couch, an unhinged door and a desk. True to the maxim that "one man's trash is another's treasure," Archambault testified that he took the desk from the third-floor landing down to his own room in the second floor apartment. Archambault also testified that he understood that the front stairway and landings were to be kept clear. The third-floor landing area, and the washing machine that was located in it, are the focus of our inquiry.

---

[6] The landlord was also a local firefighter.

## II.  LEGAL DISCUSSION

### A.  The motion to suppress

Rheault filed a motion to suppress the gun, and later amended the motion to include the drugs.  The gist of the motion was that the arresting officers had no legitimate basis to search the area where they arrested Rheault.[7]  The government's objection did not reach Rheault's substantive points, but instead argued that the evidentiary haul was lawful because Rheault had no legitimate expectation of privacy in the contraband's location.[8]  In a lengthy oral ruling, the district court denied Rheault's motion.

We review the district court's denial of a motion to suppress for clear error as to questions of fact; we apply de novo review as to the application of law to those facts and to conclusions of law.  United States v. Boskic, 545 F.3d 69, 77 (1st Cir. 2008);  Vilches-Navarette, 523 F.3d at 12.  Rheault has the

_____

[7]  Specifically, the asserted grounds were that the evidence was not in plain view; that there was no basis for a protective sweep; and that the search did not qualify as "incident to a lawful arrest."

[8]  The "expectation of privacy" issue has often been framed as one of "standing."  In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court stated that the "definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  Id. at 140. See, e.g., United States v. Vilches-Navarette, 523 F.3d 1, 13 (1st Cir. 2008) ("It is well-settled that a defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have 'standing' to claim that an illegal search or seizure occurred.") (citations omitted).

burden of establishing that "his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas 439 U.S. at 131 n. 1; United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993). His threshold burden is to prove that he had a legitimate expectation of privacy in "the place searched or the thing seized." United States v. Thornley, 707 F.2d 622, 624 (1st Cir. 1983) (citing United States v. Hershenow, 680 F.2d 847, 855 (1st Cir. 1982)). The Supreme Court has set out a two-part test for analyzing the expectation question: first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable. Smith v. Maryland, 442 U.S. 735, 740 (1979).

The government argues that Rheault satisfied neither part of the test. As to Rheault's subjective expectation of privacy, a matter on which the district court did not rule, we disagree with the government. The government premises its argument on the fact that Rheault failed to testify that he had an actual expectation of privacy in the third-floor landing or washing machine. While this is an accurate accounting of Rheault's hearing testimony, we do not attach the same legal significance to the failure that the government does. The relevant question is whether Rheault was "seek[ing] to preserve as private" the evidence at issue. Katz v. United States, 389 U.S. 347, 351 (1967). We have little doubt that

Rheault satisfies this criterion. Indeed, we have held that a defendant meets the subjective expectation test where his "purpose" in placing a box of contraband documents in a particular location "was to hide them and their incriminating contents after [a] grand jury subpoena issued." Thornley, 707 F.2d at 624; see also Hershenow, 680 F.2d at 855 (defendant's subjective expectation of privacy demonstrated because "his purpose in taking the box to [a hiding place] shortly after the search warrant was executed at his office was to hide it and its incriminating contents."). We are satisfied that Rheualt's decision to place the gun and drugs inside the washing machine on the third-floor landing sufficiently evidences an intent to hide them, and thus demonstrates a subjective expectation of privacy. But since "a legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden," id., we next turn to the much closer question of whether Rheault's subjective expectation was reasonable.[9]

---

[9] Although the parties did not specifically address the standard of review as it relates to this prong of the expectation of privacy inquiry, in other cases we have reviewed de novo the district court's determination of objective reasonableness, and we do so here. See, e.g., Vilches-Navarette, 523 F.3d at 13-14; United States v. Dunning, 312 F.3d 528, 531-32 (1st Cir. 2002). This approach is in accord with other circuits. See, e.g., United States v. Perry, 548 F.3d 688 (8th Cir. 2008); United States v. Heckencamp, 482 F.3d 1142 (9th Cir. 2007); United States v. Denny, 441 F.3d 1220 (10th Cit 2006).

Although we may start with the general proposition that "it is beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building," United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998), whether to describe the third-floor landing area as "common" is the heart of this matter. Thus, we eschew the conclusory "common area" label and engage in what is necessarily a fact-specific inquiry, taking into consideration the nature of the searched location, and using our prior decisions for guidance. See United States v. Beaudoin, 362 F.3d 60, 70 (1st Cir. 2004) ("Fourth Amendment analysis is renownedly fact specific . . . .").

None of our prior cases are directly on point, in the sense that none involved a residence with a lay-out identical to the structure involved in this case, 122-124 Middle Street. Nevertheless, the precedents are instructive. In Hawkins, for example, we found that the defendant, a tenant in a 12-unit building, had no reasonable expectation of privacy in the unenclosed areas of the building's basement where storage compartments assigned to each apartment were located. Id. 139 F.3d at 32-33. In Thornley, we upheld the denial of a motion to suppress incriminating business records which were found in the basement storage area of a three-unit apartment house. Id. 707 F.2d at 624. We highlighted the fact that the defendant was not a tenant in the building, the door to the storage area was unlocked,

and another tenant was using the storage area before the defendant placed the documents there. 707 F.2d at 624-25.

Similar to <u>Thornley</u>, <u>Hershenow</u> was another case involving an attempt to hide incriminating records. There, after a search warrant was executed at his office, the defendant took a sealed box to a location where he had worked previously. 680 F.2d at 854. He asked a maintenance worker to put the box in a storage barn. <u>Id.</u> Months later, an employee found the box, which eventually came to the attention of a postal inspector working on the defendant's case. After learning of the circumstances of storage, the inspector opened the box and found incriminating evidence. <u>Id.</u> at 855. The district court denied a motion to suppress, on the basis that the defendant had no reasonable expectation of privacy in the box or its contents. <u>Id.</u> In affirming the district court, we first noted the following factors weighing against finding a reasonable expectation of privacy: the defendant did not know the precise location of the box, other than in the barn; he did not have regular access to the barn; several months had passed since he had inquired about the box; and he had no right of control over its location. <u>Id.</u> The only countervailing factors we noted were that the box was sealed and had the defendant's name on it. <u>Id.</u>

Rheault relies heavily on cases from other jurisdictions. In <u>United States</u> v. <u>Fluker</u>, 543 F.2d 709 (9th Cir. 1976), the court found that the defendant had a reasonable expectation of privacy in

a corridor between the door of his basement apartment and the outer doorway of the apartment building. Id. at 716. In so finding, the court, while cautioning that its holding was "dictated more by the narrow circumstances" of the case, id. at 715, noted that there were only two other tenants in the building, and that the corridor at issue served only the two basement apartments. Id. at 716. This, the court said, gave the two basement tenants "considerably more control over access to that portion of the building" and thus a greater expectation of privacy than would be true of a larger building. Id.

In United States v. Drummond, 98 F. Supp. 2d 44 (D.D.C. 2000), the area in question was also a small entryway behind a locked door, and directly in front of the defendant's apartment. Id. at 48. The building had two apartments -- the defendant's ground-floor unit and a vacant unit upstairs. In finding for the defendant, the court, relying in part on Fluker, noted that the entryway was not common to anyone other than the defendant; that the general public had no access; and that the expectation of privacy was reasonable because "no one else would be in that entryway without their permission -- not mail carriers or meter readers, not other tenants or their guests . . . not anyone." Id. at 49.

Rheault contrasts his situation with the one presented in United States v. Concepcion, 942 F.2d 1170 (7th Cir. 1991), in

which the court rejected an expectation of privacy claim in the area between a locked outer door and the defendant's apartment door in a five-unit apartment building. The court emphasized the fact that all tenants used the same entrance and thus could admit unlimited guests, and that the defendant's "goings-on in the common areas" could not reasonably be expected to remain secret. Id. at 1172. Here, Rheault argues, the lack of multiple users compels the opposite result.

The government argues that the third-floor landing at 122-124 Middle Street is analogous to the areas at issue in Thornley and Hershenow, while Rheault's view is that Fluker, Drummond and Concepcion are the appropriate guideposts. The district court acknowledged the closeness of the issue and, after considering the principles enumerated by this and other circuits, denied Rheault's motion. The court relied on a number of factors, including that Rheault "could not exclude the third-floor tenants. It was not a designated storage area and one in which a reasonable person would think that he could store items that were personable [sic], or private, or of value, and be free from the scrutiny of the public." The court also noted that Rheault had no right "to exclude others from using the washing machine."

We agree with the district court that this is a close case, the resolution of which is heavily dependent on particular facts. And in the end, we agree with the district court's

conclusion.  Unlike the entryways in Fluker and Drummond -- which were immediately outside the respective apartment doors -- the third-floor landing is not, in our view, an area in which Rheault, a second-floor tenant, could reasonably expect privacy.[10]  Also weighing against Rheault is the landlord's testimony that the front-stairway landings were not to be used as storage areas. Thus, the reasonable expectations of anyone attempting to store items there would not be privacy or security, but that the items would be removed by someone -- either the landlord, or, as with Archambault's reclaimed desk, a scavenger.  This puts the defendant on even more tenuous footing than the defendant in Hawkins, endeavored -- unsuccessfully -- to suppress items that were in a designated storage area.  While the third-floor landing may have been more "private" than a traditional lobby-like common area, it was less "private" than the entryways in Fluker and Drummond, given that the landlord expressly prohibited its use for storage and that a potentially revolving cast of third-floor tenants and their guests had relatively unfettered access to the very area in which Rheault claims an expectation of privacy.  We conclude that such an expectation is objectively unreasonable, and we therefore affirm the district court's denial of Rheault's motion to suppress.

B.  Sentencing

---

[10]  If this case had involved the second-floor landing, a different outcome might result.

Rheault sets forth several sentencing arguments. We resolve all of them by resolving the first. Rheault argues the district court erred in applying the career-offender enhancement to his grouped drug convictions (counts one through four), see U.S.S.G. § 4B1.1[11], because the relevant predicate felonies were neither charged in an indictment nor proven beyond a reasonable doubt.[12] In so doing, Rheault argues against the continuing viability of <u>Almendarez-Torres</u> v. <u>United States</u>, 523 U.S. 224 (1998). However, "whatever the continuing viability of <u>Almendarez-Torres</u>, we have previously held that we are bound to follow it until it is expressly overruled." <u>United States</u> v. <u>Jimenez-Beltre</u>, 440 F.3d 514, 520 (1st. Cir. 2006) (en banc), <u>cert.</u> <u>denied</u>, 127 S. Ct. 928 (2007). Accordingly, we find the career-offender enhancement appropriate and reject Rheault's argument. Since the resulting career-offender offense level is greater than any other offense level that could result from the other enhancements applied

[11] A defendant is a career-offender if he was at least eighteen years old at the time of the offense of conviction, the offense of conviction is a felony that is either a violent crime or controlled substance offense, and he has at least two prior felony convictions of either a violent crime or controlled substance offense. Rheault does not deny that he has the requisite priors, only that they were not subject to the correct burden.

[12] Application of the enhancement raised his base offense level to thirty-two, and his criminal history category to VI. After allowing a three-level reduction for acceptance of responsibility -- for which the government moved -- a Guideline range of 151 to 188 months resulted. The court, after considering the factors in 18 U.S.C. § 3553(a), sentenced Rheault to 132 months' imprisonment.

-15-

by the district court, we need not consider Rheault's arguments relating to the remainder of the district court's Guideline calculations.  <u>See</u> U.S.S.G. § 4B1.19(b).

The district court's denial of Rheault's motion to suppress and its sentencing decision are **<u>affirmed.</u>**