LIPEZ, Circuit Judge.
This case raises challenging questions about the legality of a stop-and-frisk conducted after law enforcement officers forced their way into a house occupied by a group of unrelated individuals to execute an arrest warrant. Inside the residence, the officers encountered and pat-frisked appellant James Werra — who was not the subject of the warrant — and discovered a gun in his pocket. After Werra was charged with being a felon in possession of a firearm, see 18 U.S.C. § 922(g)(1), he unsuccessfully sought to suppress the gun as the fruit of an unlawful search. The district court concluded that the officers lawfully entered the house and that Werra’s detention and frisk were justified as reasonable safety measures. Having failed to obtain suppression of the weapon, Werra entered a conditional guilty plea.
On appeal, Werra reiterates his contentions that the officers lacked the necessary level of suspicion to justify entry of the house without consent and that, like the residents of a traditional single-family home, he had a reasonable expectation of privacy in the foyer and other common areas of the house. Hence, he claims that the officers’ forced entry violated his Fourth Amendment rights and the gun must be suppressed. Alternatively, he argues that his suppression motion should have been granted because the officers had no justification for conducting the frisk that produced the weapon.
After close consideration of the law and the facts, we conclude that the officers had insufficient grounds to justify entering the house without consent. We also conclude that Werra demonstrated an expectation of privacy in the foyer of 63 Menlo Street sufficient to challenge the officers’ unlawful entry into the dwelling. The stop-and-frisk of Werra thus violated his Fourth Amendment rights, and he is entitled to suppression of the firearm seized from him. Accordingly, we vacate his conviction, reverse the denial of his motion to suppress, and remand for further proceedings.
I.
We recite the underlying facts as found by the district court, noting where relevant the defendant’s contrary view of the testimony presented at the suppression hearing.
On the morning of November 10, 2006, Police Detective Michael Schaaf and Massachusetts State Trooper Robert Fries were driving around Brockton, Massachusetts, seeking to execute outstanding arrest warrants, including one for Jeanine Daley. They encountered a police informant named Christine, who previously had provided Schaaf with reliable information about the location of a suspect. Christine told the officers that she recently had seen Daley at 63 Menlo Street, a house in a residential neighborhood that Schaaf had been told within the previous year was a “sober house” for recovering drug abusers. Christine told the officers that Daley, whom Schaaf knew to be a drug abuser, was “staying” there.[1]
*329 The officers proceeded to 63 Menlo Street. Their knock at the front door was answered by Jeffrey Cicerano, a familiar figure to Schaaf because Schaaf had once arrested Cicerano on an outstanding warrant. Cicerano was the named tenant on the lease for 63 Menlo Street and paid most of the $3,000 rent, but other people lived there and contributed to that payment. Appellant Werra paid Cicerano to rent the third floor, which had a bedroom, kitchenette, and a bathroom. Although Werra’s girlfriend and her child had at some point lived with him there, they had moved out before November 10. After their departure, Werra at times slept on a couch in the living room “because people would ‘party’ on the third floor.” United States v. Werra, No. 06-10414, 2008 WL 4280035, at *1 (D.Mass. Sept. 11, 2008) (order denying motion to suppress).
Schaaf testified that when he saw Cicerano at 63 Menlo Street, he became concerned that the residence had become a “drug house.” Standing outside the front door, Schaaf asked Cicerano if he could talk with him and others in the house. Cicerano asked if Schaaf had a warrant. Schaaf said he did not, and then asked if he needed one. Cicerano answered affirmatively and started to walk away from the door. The officers responded by kicking at the bottom of the door, prompting Cicerano to turn back and offer to talk with them outside.
As Cicerano opened the door, however, the officers pushed past him into the entry foyer.[2] Despite Cicerano’s demands that the officers leave, they persisted and instructed Cicerano to bring everyone in the house down to the entry area. Cicerano went upstairs, and the officers turned their attention to the living room that was adjacent to the foyer. Through a partially open set of pocket doors, Schaaf and Fries observed Werra sitting on a couch, where he was — in Schaafs words — “just sort of staring out into space.” Schaaf asked Werra if he was all right, but received no response.
Schaaf then heard sounds behind him, and he turned to see three individuals entering the foyer. Two emerged from a first-floor bedroom and the third came from the kitchen, which was located at the back of the house opposite the front door. Seeing movement out of the corner of his eye, Schaaf turned again to see Werra walking out of the living room toward him. Werra’s hands were in his front pants pockets. Schaaf saw a clip on the right pocket that he recognized as part of a pocket knife, and he reached over and removed the knife from the pocket. Observing that Werra’s left hand was still in his other pocket and “moving a little bit,” Schaaf patted Werra down and felt a hard object that he identified as a firearm. He removed the gun and told Werra he was under arrest. Werra attempted to flee, but was subdued after a brief struggle. He was subsequently charged for unlawfully possessing the weapon as a felon.[3]
In ruling on Werra’s motion to suppress the gun, the district court issued a thoughtful 27-page decision that focused on two separate aspects of the officers’ conduct: their entry into 63 Menlo Street *330 and the stop-and-frisk of Werra. The court concluded that no Fourth Amendment violation occurred with respect to either action. It found that the officers had the requisite level of suspicion that Daley was inside 63 Menlo Street to permit forced entry into the house to execute the warrant for her arrest. The court also held that, given the lawful entry, the officers were allowed to briefly detain Werra while they looked for Daley and arrested her. The court further concluded that frisking Werra was justified given the circumstances, which included his possession of the knife and the officers’ suspicion that the residence was being used as a “drug house.”[4]
Having rejected Werra’s challenge to the legality of the frisk that produced the gun, the court denied his motion to suppress the weapon. Werra’s conditional guilty plea and this appeal followed.
II.
Werra claims that his Fourth Amendment rights were violated in two distinct ways, and he asserts that either violation is sufficient to require suppression of the firearm seized from him. First, he contends that the officers unjustifiably forced their way into 63 Menlo Street — his residence — and that any evidence resulting from their unlawful presence in the house must be suppressed. Werra alternatively claims that, whether or not the officers were lawfully present in the foyer, they lacked justification for conducting the stop-and-frisk that revealed the gun. As described above, the district court rejected both of these contentions.
In evaluating a district court’s denial of a motion to suppress, we review its findings of fact for clear error and apply de novo review “to the application of law to those facts and to conclusions of law.” United States v. Rheault, 561 F.3d 55, 58 (1st Cir.2009). Werra bears the burden of showing a violation of his Fourth Amendment rights. Id. 58-59.
The government argues that the court’s rulings are supportable on multiple, independent grounds. First, it asserts that, under Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the officers lawfully entered 63 Menlo Street without consent to execute the arrest warrant for Daley,[5] and, once inside, they had the right under Michigan v. Summers, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), to detain Werra to ensure that the warrant could be executed “safely and effectively.” See Werra, 2008 WL 4280035, at *7.[6] The government argues that the frisk became necessary and proper because of the officers’ objectively reasonable *331 suspicion that Werra was armed and dangerous. See Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).
Second, the government argues that Werra may not challenge the officers’ entry into, or presence in, the house because he lacked a reasonable expectation of privacy in the foyer — the location in which he was detained and frisked. See New York v. Class, 475 U.S. 106, 112, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (“[T]he State’s intrusion into a particular area ... cannot result in a Fourth Amendment violation unless the area is one in which there is a ‘constitutionally protected reasonable expectation of privacy.’” (quoting Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring))); Rheault, 561 F.3d at 59. Under this theory, even if there was an unlawful entry that foreclosed reliance on the Summers rationale, the government contends that the officers’ interactions with Werra were permissible under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[7]
Our analysis begins with Werra’s expectation of privacy in the premises at 63 Menlo Street. After explaining why we conclude that Werra has shown the necessary privacy interest, we address the lawfulness of the officers’ entry into the house. The results of those discussions make it unnecessary for us to evaluate the propriety of the stop-and-frisk.
A. Werra’s Reasonable Expectation of Privacy in 63 Menlo Street
Whether a defendant has a reasonable expectation of privacy in a particular place is a two-pronged inquiry. We consider , “first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable.” Rheault, 561 F.3d at 59. The inquiry is necessarily fact-dependent, “taking into consideration the nature of the searched location, and using our prior decisions for guidance.” Id.; see also United States v. Beaudoin, 362 F.3d 60, 70 (1st Cir.2004) (“Fourth Amendment analysis is renownedly fact specific.... ”), vacated on other grounds by Champagne v. United States, 543 U.S. 1102, 125 S.Ct. 1025, 160 L.Ed.2d 1009 (2005) (mem.). As the district court recognized, Werra’s privacy interest in the foyer of 63 Menlo Street is linked to “the proper characterization of the building itself.” Werra, 2008 WL 4280035, at *3. As the resident of a dwelling that is “akin to a traditional home,” id. at *4, he would possess a reasonable expectation of privacy throughout the interi- or of the premises. See Payton, 445 U.S. at 590, 100 S.Ct. 1371 (“[T]he Fourth Amendment has drawn a firm line at the entrance to the house.”); United States v. Weidul, 325 F.3d 50, 52 n. 1 (1st Cir.2003) (noting that a defendant who was “staying or living” with a friend had an expectation of privacy in the friend’s home). If the residence were comparable to a multi-unit apartment building, however, with “[d]istinct, complete living spaces,” Werra, 2008 WL 4280035, at *4, Werra’s privacy interest would not extend to common areas such as the foyer. See, e.g., Rheault, 561 F.3d at 59 (noting well settled precedent that “ ‘a tenant lacks a reasonable expectation of privacy in the common areas of an *332 apartment building’ ” (quoting United States v. Hawkins, 139 F.3d 29, 32 (1st Cir.1998))); United States v. Brown, 169 F.3d 89, 92 (1st Cir.1999) (rejecting Fourth Amendment claim based on officer’s entry into the lobby of apartment building).
The district court aptly observed that 63 Menlo Street “does not fit squarely into the paradigm for either a traditional family home or a multi-unit apartment building.” Werra, 2008 WL 4280035, at *4. Although it is a single-family structure, the residents were not a traditional single family occupying the house together. As other courts have held with respect to rooming houses and fraternities, however, an unconventional household does not necessarily diminish the protection afforded the residents of the house. See, e.g., Reardon v. Wroan, 811 F.2d 1025, 1027 n. 2 (7th Cir.1987) (noting that “fraternity members could best be characterized as ‘roommates in the same house,’ not simply co-tenants sharing certain common areas”); State v. Titus, 707 So.2d 706, 708 (Fla.1998) (“The mere fact that certain rooms traditionally associated with a home are shared by rooming house residents does not render the structure any less a home to those residents.”); People v. Garriga, 189 A.D.2d 236, 596 N.Y.S.2d 25, 28 (N.Y.App.Div.1993) (“[Ejxisting precedent, although sparse, supports the conclusion that the internal hallway area of this rooming house was part of the defendant’s home for Fourth Amendment purposes.”). But see, e.g., United States v. Anderson, 533 F.2d 1210, 1214 (D.C.Cir.1976) (holding that “appellant’s constitutionally protected privacy interest began at the door to [his] room ... rather than at the door to the entire rooming house”).[8]
Thus, we agree with the district court that, unlike the typical expeetation-of-privacy inquiry, which focuses solely on the particular location in which the evidence the defendant seeks to suppress was found, see, e.g., United States v. Bucci, 582 F.3d 108, 116 (1st Cir.2009) (front of home, as viewed by video camera); Rheault, 561 F.3d at 59 (third-floor landing of the front stairway); United States v. Meada, 408 F.3d 14, 22 (1st Cir.2005) (gun case), we must conduct a broader examination of Werra’s and the other tenants’ living arrangements throughout 63 Menlo Street. If they lived separately— like apartment dwellers — they could not claim the common areas of the house, including the foyer, as their private space vis-a-vis outsiders. However, if they did not live in individualized “residences” within the house — and were thus more like the occupants of a single-family home — their right to privacy vis-a-vis outsiders would begin at 63 Menlo Street’s front door. Under the latter scenario, the officers would have violated Werra’s reasonable expectation of privacy by forcibly entering the house. We thus also agree with the district court that the relevant considerations for our inquiry include whether the building contains “recognizably separate living units,” the residents’ right to exclude others from parts of the building, the number of residents, and the “formal legal relationship” among them. Werra, 2008 WL 4280035, at *4-5. Other facts that shed light on how the tenants viewed the dwelling, including the tenants’ customary use of various spaces within the *333 premises, also are pertinent in evaluating their subjective expectation of privacy.
We think it of particular note that, unlike an apartment building in which tenants contract individually with the landlord, 63 Menlo Street was rented as a whole by Cicerano. He described it as “my house” at the suppression hearing and, indeed, Cicerano reported that he paid most of the $3,000 rent — though “everybody pitched in.” The district court listed about a half-dozen individuals who were living in the residence at the time of the police entry. They were not related— Cicerano, in fact, did not know the last name of a tenant named Paul — but they were also not thrown together randomly. Cicerano explained that the residents were “basically just friends trying to make it through ... [n]ot living on the street.” The operation of 63 Menlo Street was thus in some respects a collective undertaking, with both the financial arrangements and the informal relationship among the residents suggestive of a single household.
The residents’ use of the house points in the same direction. Werra paid rent specifically for the third floor, which contained a bathroom and a kitchenette, and it apparently could have been used as a self-contained unit. At the time of the police entry, however, Werra was not the only person to regularly make use of the third floor, and he did not live solely within it. Werra testified that he had spent “[m]any nights” sleeping on a couch in the living room on the first floor because “when I was up on the third floor, everybody wanted to come up on the third floor.”
Other testimony from Werra and Cicerano, although not fully consistent, also indicated that neither Werra nor the other tenants viewed the third floor as an independent living unit at the time the officers entered the house. Werra acknowledged that the third floor was his “own personal space,” but said that he had been paying rent for that space only until his girlfriend moved out at the end of October.[9] He testified that, more recently, he had been sleeping in the living room. He explained that he did not have a bed on the third floor — only a pull out couch — and said he and his brother moved furniture into the living room so he could stay there.
Cicerano confirmed that Werra relocated to the living room because the third floor was at times taken over by others, although he described Werra’s relocation as intermittent rather than ongoing. He testified that Werra “once in a while” slept in the living room “because there was a lot of partying basically, and a lot of people went to the third floor, so when he wanted to sleep, sometimes he’d go in there.” Cicerano reported that the third floor had a door and that Werra had the ability to keep people out, but he also indicated that it would have been difficult for Werra to exclude others on the night before the November 10 incident because the first floor was “shut down” in the aftermath of Cicerano’s mother’s funeral.[10] Taken as a whole, the evidence regarding Werra’s use *334 of the living room showed that he slept there at least intermittently, with Cicerano’s consent but at Werra’s own discretion.
Although the record contains no direct evidence about Werra’s use of the downstairs kitchen and the other bathrooms in the house, Cicerano stated that people would sometimes congregate in the kitchen that adjoined Cicerano’s bedroom on the first floor. Given his proximity to the downstairs kitchen when he was sleeping in the living room, it is a fair inference that Werra was at times part of such a group. In addition, when Werra was asked at the suppression hearing to confirm that there was a bathroom on the third floor, he noted that bathrooms also were located on the first and second floors — indicating that he had used them instead of bothering to climb up the stairs.[11]
Not all rooms, however, were open to all tenants. Cicerano had a lock on his bedroom door, and he rarely allowed others to use the adjacent living room because he did not want to be disturbed when he was sleeping. Like Werra, other tenants were assigned specific rooms; Cicerano testified, for example, that Paul “rented a room on the second floor.”
Yet, on balance, Cicerano’s and Werra’s testimony indicates that the tenants shared the house in much the same way as would a traditional family. Offspring in a single-family home may at times lock bedroom doors or post “do not enter” signs aimed at excluding their siblings and parents from their assigned rooms. And, just as occurs in the traditional family context, the supposed exclusivity of personal space at 63 Menlo Street — at least with respect to Werra’s third-floor quarters — was not always respected. Werra’s co-tenants were undeterred by the door to the third floor when that space was “needed” for their comfort and enjoyment. Werra behaved similarly, claiming alternative space in the house when the third floor was targeted by others. Though Cicerano limited access to the living room to suit his needs, the record shows that the tenants shared use of the first-floor kitchen and the second- and third-floor bathrooms. These circumstances are a far cry from a typical apartment building setting, where tenants live within discrete units and use common spaces, such as hallways and basements, primarily for storage or access to the outside.
In analyzing whether Werra had demonstrated that 63 Menlo Street was sufficiently like a traditional home to give him an expectation of privacy in relation to outsiders throughout the premises, the district court began by noting that the evidence “lacked many details concerning the rights of the residents within the building and the relationships among those who lived there.” Werra, 2008 WL 4280035, at *5.[12] The court observed that the third floor “appear[ed] to have been an independent living unit from which Werra could *335 exclude others,” and it stated that Werra “had no reasonable expectations of privacy in the foyer because others over whom he had no control could pass through it without his permission.” Id. The court concluded its analysis by noting that Werra’s expectation of privacy in the living room “was limited to the permission for use granted by Cieerano.” Id.
The government urges us to adopt the district court’s conclusion that “the absence of ... key facts” means that Werra failed to carry his burden of showing that 63 Menlo Street was equivalent to a traditional home. Id. We agree that the record was less than ideal. That the evidence could have been stronger, however, does not make it inadequate. As we have described, the facts found by the district court indicate that day-to-day living for the tenants at 63 Menlo Street, including Werra, occurred throughout the house. Although the record does not show that the unrelated individuals who resided at 63 Menlo Street behaved like a traditional family, it does show that they were not merely co-tenants who passed through the common spaces of the house on the way to and from their independent pursuits. Rather, like the fraternity members described in Reardon, the residents of 63 Menlo Street “could best be characterized as ‘roommates in the same house,’ not simply co-tenants sharing certain common areas.” 811 F.2d at 1027 n. 2. Indeed, the residents at 63 Menlo Street were all living with Cieerano, in “his” house, as part of a nontraditional single-“family” household. As Cieerano put it, Werra “stayed at my house, he lived at my house.”
The district court’s analysis does not address the facts showing that 63 Menlo Street was operated as a single household, including Cicerano’s notable testimony that he paid most of the rent. The court’s finding that Werra could have lived independently and excluded others from the third floor is correct, but that theoretical arrangement did not reflect the evidence on how Werra and the other residents actually lived. Although the dissent focuses on the discrepancy between Werra’s and Cicerano’s testimony about how frequently Werra slept in the living room, the analysis is the same whether Werra did so intermittently or “[m]any nights”; the fact remains that it was an ordinary occurrence for others to use the third floor and for Werra to relocate to the living room. Moreover, Werra testified that his brother helped him move furniture into the living room, conduct that shows a belief that he had a personal claim to the space — albeit a claim that was subject to the quiet use that was demanded by Cieerano.[13]
The government cites no case in which a resident of a single-family structure was found to lack a reasonable expectation of privacy, relative to outsiders, in the eom *336 mon areas of his or her house. Instead, it points to inapposite cases involving duplexes or larger buildings in which tenants lived in separate, fully self-contained units. Similarly, the district court mistakenly adopted the frame of reference for multiunit buildings in observing that Werra lacked a privacy interest in the foyer because others living in the house could pass through the entryway without his permission. The inability to exclude cohabitants from shared spaces within a traditional home does not on its own eliminate a resident’s privacy interest in keeping outsiders from barging through the front door. Individuals routinely bring friends into their homes without the consent of every family member who resides there, and such unilateral decisions do not convert the hallway or entrance of a private home into a public space. There is no evidence that people who did not live at 63 Menlo Street routinely entered without the consent of a resident, which might have undermined the presumption of privacy that normally attends the interior of a residence.[14]
In sum, based on the facts of record, we conclude that Werra has met his burden to show that he possessed a subjective expectation of privacy in the foyer of 63 Menlo Street — or, more specifically, that he believed the entire house, and not just the third floor, served as his home and, hence, that he could prevent the entry of anyone whom he and his housemates wished to keep out. We further conclude that, on this record, Werra’s expectation of privacy was reasonable. A resident of a single-family structure who shares living arrangements as did the tenants of 63 Menlo Street could reasonably expect that his right to privacy begins at the front door. See Titus, 707 So.2d at 708 (holding that, “just like private homeowners, rooming house residents have an actual expectation of privacy in the common areas of the rooming house” and that “given the sanctity of the home, society is prepared to recognize that expectation as reasonable”).[15]
Because Werra had a reasonable expectation of privacy in the foyer, he is entitled to challenge the officers’ forcible, warrant-less entry into the house. The government claims that the officers lawfully entered to execute the arrest warrant for Daley. We now turn to that contention.
B. The Officers’ Entry into the House
In Payton v. New York, the Supreme Court held that police officers attempting *337 to execute an arrest warrant have “limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.” 445 U.S. at 603, 100 S.Ct. 1371. Payton’s two-prong inquiry thus requires us to ask whether Schaaf and Fries had a sufficient basis to believe that Daley (1) lived at 63 Menlo Street and (2) was at home at the time of their entry. The district court described the issue as “close” and the evidence supporting the government’s position as “thin.” Werra, 2008 WL 4280035, at *9. The government itself stated at oral argument before the district court that the arrest warrant did not give the officers the authority to enter the house.[16] Nonetheless, the court concluded that “a reasonable officer in the same position could have formed an objectively ‘reasonable belief that Jeanine Daley lived at the premises and was present at the time of entry.” Id. at *10.
As a threshold matter, Werra argues that the court’s use of the “reasonable belief’ standard was incorrect, and that the officers instead needed to demonstrate that they had probable cause to believe that Daley lived in the Menlo Street house and was home on the morning of November 10. Although most circuits to have considered the issue have adopted the “reasonable belief’ standard, and treat it as less stringent than probable cause, see, e.g., El Bey v. Roop, 530 F.3d 407, 416-17 (6th Cir.2008); United States v. Thomas, 429 F.3d 282, 286 (D.C.Cir.2005); Valdez v. McPheters, 172 F.3d 1220, 1224-25,1227 n. 5 (10th Cir.1999); United States v. Lovelock, 170 F.3d 339, 343 (2d Cir.1999), the Ninth Circuit requires probable cause, see United States v. Gorman, 314 F.3d 1105, 1115 (9th Cir.2002). We have not explicitly made a choice, but have implicitly accepted the majority view. See, e.g., United States v. Graham, 553 F.3d 6, 12-14 (1st Cir.2009). In this case, the government cannot meet even the less stringent reasonable belief standard.
The relevant information possessed by the officers in this case, as found by the district court, was the following: (1) an informant (Christine) told the officers that she had recently seen Daley at 63 Menlo Street and that Daley was “staying” there, Werra, 2008 WL 4280035, at *9; (2) Christine had previously provided Schaaf with accurate information about the location of a suspect; (3) Schaaf was aware that Daley had been a drug abuser; (4) on Schaaf s previous visit to 63 Menlo Street, within the previous year, “he had observed it to be a sober house with tenants living on the premises,” id.; and (5) the officers arrived at the house “relatively early in the morning, at approximately 10:00 a.m.” id. at *10.
We doubt that this information was sufficient to support even the first prong of the Payton inquiry — that Schaaf and Fries could reasonably believe that Daley was living at 63 Menlo Street when they forced their way into the house. Although eyewitness evidence from a reliable informant that an individual was staying at a certain location might in some circumstances suffice to support a reasonable suspicion that the individual lives there, the context here does not permit such reliance on Christine’s statement. In his affidavit, Schaaf reported that Christine had told the officers that at some point “recently” — a term *338 that could refer to days or weeks earlier[17] —she had seen Daley at the Menlo Street house. Cf. United States v. Pruitt, 458 F.3d 477, 478-79 (6th Cir.2006) (finding reasonable belief that the suspect was present where, inter alia, an anonymous caller had reported seeing him “within the past few hours”).
A different home address appeared on the arrest warrant for Daley and, even accepting that she had stayed at the Menlo Street house “recently,” the officers neither conducted surveillance nor took any other steps to verify that her stay had not been temporary. If the house were a sober house, as Schaaf had been told, Daley might have passed through only briefly in an attempt to deal with her drug abuse problem. An extended stay was no more inevitable if the house were instead a haven for drug users, which Schaaf said he suspected when Cicerano — another known drug user — came to the door.
The skimpy evidence of Daley’s residency at 63 Menlo Street contrasts sharply with the information available to officers in other cases raising a Payton issue. For example, in Graham, 553 F.3d at 13, a police report about a domestic incident identified the defendant as the offender and gave his address as the building where he was subsequently arrested. In addition, the officers had tried to execute the warrant at the defendant’s previous address, but did not find him. Id. at 10. Similarly, in United States v. Clayton, 210 F.3d 841 (8th Cir.2000), a police record indicated the defendant lived at the address where the arrest was made. Id. at 842; see also, e.g., United States v. Jones, 523 F.3d 31, 37 (1st Cir.2008) (finding entry into hotel room lawful where hotel manager told officers that suspect had rented a particular room for three weeks, and a man detained in the parking lot told officers that suspect was then inside the suite); United States v. Pelletier, 469 F.3d 194, 197, 200-01 (1st Cir.2006) (finding entry into a motel room lawful where officers who went to defendant’s home were told he was not there; defendant’s girlfriend’s sister said he was at a certain room at a motel; the room was registered in the sister’s name; and a motel maintenance worker identified the defendant as the sole occupant of the room); Valdez, 172 F.3d at 1226-27 (finding entry justified where, among other factors, suspect had told an officer that he lived at the location and other law enforcement officers informed the entering authorities that he lived there); United States v. Risse, 83 F.3d 212, 214-16 (8th Cir.1996) (finding entry lawful where, among other factors, the defendant had told the police that she was “staying” at the location and the officers could contact her there).
Even if the informant’s tip, together with Schaaf s general impression of 63 Menlo Street, were enough to support a reasonable belief that Daley was living in the house, there was not a shred of evidence to satisfy the second Payton prong — that the officers reasonably believed she was in the house at the time they entered. As noted above, the officers made no attempt to confirm the currentness of Christine’s information by, for example, conducting surveillance or placing a telephone call to the house. Cf. El Bey, 530 F.3d at 417 (noting that “a review of the relevant caselaw indicates that law enforcement officers often rely on independent investigation and observations of the premises to determine whether a suspect is actually inside before entering”). Al *339 though “actual viewing of the suspect on the premises is not required,” Valdez, 172 F.3d at 1226, the officers must point to at least some evidence suggesting that the individual named in the arrest warrant is present. See id. (citing numerous cases and various types of circumstantial evidence, including presence of a car associated with the suspect and knowledge of employment circumstances that would make it likely the suspect would be at home and asleep); see also Pruitt, 458 F.3d at 483 (same, noting that reasonable belief may be generated by “consideration of common sense factors and the totality of the circumstances”).
The government asserts that officers should not be expected to “conduct resource-draining stake-outs in order to arrest suspects at their known residences,” and it correctly points out that courts regularly uphold entries where the time of day suggested the suspect’s presence at home. See, e.g., Thomas, 429 F.3d at 286 (noting that “the early morning hour [between 6:00 and 6:30 a.m.] was reason enough” for the officers to believe the defendant would be at home); United States v. Bervaldi, 226 F.3d 1256, 1267 (11th Cir.2000) (concluding that it was “reasonable to believe, in the absence of contrary evidence, that [suspect] would be at his residence at 6:00 in the morning”); United States v. Terry, 702 F.2d 299, 319 (2d Cir.1983) (finding reasonable belief that suspect would be at home at 8:45 a.m. on Sunday morning); United States v. Bridgewater, 333 Fed.Appx. 470, 472 (11th Cir.2009) (holding that “[e]arly morning police entry [7:00 a.m.] weighs in favor of finding that the officers reasonably believed [suspect] was inside the house”). The government argues that, as in those cases, Schaaf and Fries reasonably could rely on the time of day and assume that Daley was home at 10:00 a.m. on the Friday morning they entered 63 Menlo Street.
The time-of-day precedent, however, does not support the conclusion the government wishes us to draw. In the cases cited by the government and in others where timing was a factor, there was no serious question that the location of the arrest was where the defendant lived,[18] and information beyond timing frequently contributed to the officers’ reasonable belief that the suspect was present. See, e.g., Valdez, 172 F.3d at 1227 (holding that midday entry was constitutional where suspect “was unemployed, liked to stay out late drinking, [and] sometimes abused drugs such as heroin and cocaine”); United States v. Munoz, 150 F.3d 401, 407, 411 (5th Cir.1998) (listing officers’ 5:00 a.m. arrival as one factor supporting reasonable belief suspect was at home); United States v. Lauter, 57 F.3d 212, 213, 215 (2d Cir.1995) (finding reasonable belief that suspect was in the apartment at 8:30 a.m. Monday because he “was unemployed and typically slept late”); United States v. Hayes, 209 Fed.Appx. 548, 551 (7th Cir.2006) (rejecting challenge to reasonable belief that suspect would be home as frivolous where police “entered at 10:00 a.m. on a weekday” and the suspect “was an unemployed drug addict with no car”).
*340 The fact that an individual is known to live at a particular location is one sound reason to expect him or her to be there. See 2 Wayne R. LaFave, Search and Seizure § 6.1(a) (4th ed. 2004) (noting that “the police need not possess ‘special knowledge’ that the defendant is at home ... for in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there”). Here, however, the officers’ knowledge of Daley’s residence consisted only of Christine’s imprecise, uncorroborated statement that Daley had “recently” been staying at 63 Menlo Street.
Moreover, there is no evidence to suggest that Daley ordinarily would be home at 10:00 a.m. on a weekday, wherever she lived. So far as the record shows, the officers had no information about whether she was employed or about her nighttime and daytime routines. Entering a home at 10:00 a.m. is significantly different from entering at 5:00 or 6:00 a.m., when even working individuals can reasonably be presumed to be at home. The fact that Daley was a drug abuser possibly living in a “party” house or a recovering drug user living in a sober house does not reveal her employment status or inclination to sleep late. Nor does the crime for which the warrant was issued — a non-violent probation violation stemming from a conviction for larceny of a motor vehicle' — suggest that she was likely to be unemployed and at home. In sum, none of the factors typically considered to be evidence of a suspect’s presence were part of the record here.[19] In these circumstances, the officers could not have formed a reasonable belief that Daley was at 63 Menlo Street when they forcibly entered the house.[20]
*341 The government thus got it right the first time, when it told the court that the information available to the officers was insufficient to support a reasonable belief that Daley would be inside 63 Menlo Street at the time they entered the house. Hence, the officers’ entry into the foyer was unlawful and, because Werra possessed a reasonable expectation of privacy there, the illegal entry violated his Fourth Amendment rights. The firearm seized in the course of the stop-and-frisk was a fruit of that violation and, accordingly, it should have been suppressed. See Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Sanchez, 612 F.3d 1, 4 (1st Cir.2010).
We hasten to add that we are not suggesting that officers who unlawfully enter a home must subject themselves to the risk of being harmed by a resident whom they believe is armed and dangerous. They are certainly entitled to take reasonable actions to defend themselves.[21] But the reasonableness of the officers’ interaction with such an individual for that protective purpose does not determine the Fourth Amendment suppression issue generated by the unlawful entry. In this case, because Werra had a reasonable expectation of privacy in the foyer and the officers entered the house unlawfully, the officers’ encounter with Werra and the discovery of the gun were both results of the officers’ unconstitutional conduct. Werra was thus entitled to suppression of the gun.
We therefore reverse the district court’s denial of Werra’s motion to suppress, vacate Werra’s conviction, and remand the case for further proceedings consistent with this opinion.

So ordered.

. Appellant argues on appeal that the district court went beyond the evidence in finding *329 ihat Christine told the officers that Daley not only was seen at 63 Menlo Street, but also was "staying” there. Although the record lends support to appellant's contention, resolution of the factual dispute is unnecessary. See infra note 20.

. The officers testified that Cicerano had invited them into the house, but the district court "largely credit[ed]” Cicerano’s contrary account of their entry. Werra, 2008 WL 4280035, at *1 n. 1.

. Daley was in fact found at 63 Menlo Street and arrested.

. Recognizing that the facts underlying the motion to suppress "offer the potential for multiple branches to the decision tree," the district court also assessed Werra’s reasonable expectation of privacy in the foyer at 63 Menlo Street. Weira, 2008 WL 4280035, at *1, *3-5.

. In Payton, the Supreme Court held that a valid arrest warrant “implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.” 445 U.S. at 603, 100 S.Ct. 1371.

. In Summers, the Court held that a search warrant gives officers "the limited authority to detain the occupants of the premises while a proper search is conducted.” 452 U.S. at 705, 101 S.Ct. 2587. This case involves an arrest warrant rather than a search warrant, but the district court found the difference of no consequence. It noted that other courts have extended Summers to the arrest context on the ground that "the same law enforcement interests are applicable in both scenarios.” Werra, 2008 WL 4280035, at *7 (citing Cherrington v. Skeeter, 344 F.3d 631, 638 (6th Cir.2003); United States v. Enslin, 327 F.3d 788, 797 (9th Cir.2003)).

. In United States v. Romain, 393 F.3d 63 (1st Cir.2004), we "decline[d] to adopt a per se rule banning the Terry [stop-and-frisk] doctrine from residential settings” and "similarly decline[d] any rule-like suggestion that Terry’s requirement of particularized suspicion is in any way diminished within the home simply because an officer legitimately enters upon its premises.” Id. at 76 n. 3.

. We acknowledge, as the dissent emphasizes, that there are other cases relevant to the expeclation-of-privacy issue. None is precisely on point, and we find none more apt than the ones we have cited. As we have explained, the expectation-of-privacy inquiry requires a close, holistic review of the particular record at issue. Our conclusion in this case is a product of such a review.

. The specific exchange between the prosecutor and Werra was as follows:
Q. That was your own personal space up
there, correct?
A. Uh-huh.
Q. That’s what you were paying rent for?
A. When Melissa was there, yes.

. When asked if Werra could shut the door to the third floor Cicerano responded: "I imagine, yeah. But with the downstairs being shut down, if you’re asking me could people have partied up there that night? I can't tell you.” Cicerano was then asked if Werra "had the ability, had he wanted to, to keep people out of the third floor.” He responded: “Yes, but with the first floor being shut down, it would have been kind of — yeah, yeah, he did.”

. The exchange on that issue, in relevant part, was as follows:
Q. But at some point you decided it was too much trouble to go upstairs, and you just started living on the first floor there instead?
A. Yes.
Q. The third floor had a bathroom, correct?
A. Yes, it did.
Q. And it was only three flights up, correct?
A. Yeah, but there was also a bathroom on the first and second floor.

. As an example of the imprecision in the record, the court stated that "it is unclear whether the residents shared bathrooms and kitchens, to precisely what extent they were assigned specific parts of the building, and whether they locked doors to keep other people out.” Werra, 2008 WL 4280035, at *5.

. Even if, as our dissenting colleague asserts, the district court impliedly credited Cicerano’s notion of how often Werra slept in the living room over Werra's statement that he spent many nights there, there is no basis for concluding that the court generally disbelieved Werra and hence we should disregard all of his testimony. The court’s analysis of Werra's expectation of privacy in the foyer was brief and, as noted, it emphasized the details missing from the record.
We thus disagree with the dissent’s suggestion that we have not been appropriately deferential to the district court's fact-finding. Our dispute is with the court’s legal conclusion that the facts of record did not show that Werra possessed a reasonable expectation of privacy in the foyer. That ultimate issue, involving application of law to facts, is subject to de novo review. See Rheault, 561 F.3d at 58. Moreover, our obligation to draw all reasonable inferences in the government’s favor, see United States v. Dubose, 579 F.3d 117, 120 (1st Cir.2009), does not require us to ignore facts favorable to the defendant.

. Of course, this would be a very different case if Cicerano had given the officers permission to enter. Even with a reasonable expectation of privacy in the entire premises, Werra could not challenge the officers' presence in the foyer if Cicerano had let them in. See United States v. Matlock, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ("[C]o-inhabitants ... have assumed the risk that one of their number might permit the common area to be searched.”); cf. Georgia v. Randolph, 547 U.S. 103, 106, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (holding that "a physically present co-occupant's stated refusal to permit entry prevails”). The government does not challenge on appeal the district court’s finding that the officers entered the house without consent.

. The subjective beliefs of Werra and the other tenants are a particularly significant component of the analysis here because they shed light on the nature of the living arrangements within the single-family house. The tenants’ belief that they may occupy spaces throughout the house, and their behavior reflecting that belief, evidence a subjective expectation of privacy vis-a-vis outsiders akin to that possessed by the members of a traditional single-family household. That traditional expectation of privacy begins at the front door of the home, and there is thus no need to examine Werra's use of the foyer in particular. The objective reasonableness of Werra’s subjective expectation of privacy depends, as we have described, on a holistic assessment of the facts of record.

. In response to a question from the court, the prosecutor responded:
Your Honor, I don't think had it infringed on any expectation of privacy of the defendant, I don't think the officers had enough information about the presence of Jeanine Daley in there to rely on the arrest warrant. I think it was an insufficient basis for th[eir] being in the building and seeking to find her there.

. Given that it was early in the morning, we see no basis for an inference that “recently” meant earlier that day.

. In Thomas, a federal officer testified, without details, that the defendant’s address was learned "after an 'investigation was done.' ” 429 F.3d at 286. In holding that the testimony was sufficient to establish a reasonable belief that the defendant lived at that address, the court noted that the defendant was a parolee who was required to keep his current address on file with his parole supervision officer. Id. The likely source of the information was therefore apparent and reliable. See id. (noting that the defendant did not attempt to elicit details of the investigation).

. The dissent mistakenly construes our analysis in suggesting that we are improperly demanding more than a "reasonable belief” that Daley resided at 63 Menlo Street. We have merely pointed out that, in cases where time of day has provided a basis for believing a suspect would be at home, the location of the suspect’s residence was well established— making it more likely that he or she would be there. By contrast, where the officers knew only that Daley had "stayed” at a residence not known to be her home at some undefined “recent” time, arriving at mid-morning on a work day cannot on its own support a reasonable belief that she would be there. Moreover, recognizing that a relationship may exist between the officers’ knowledge on the two Payton prongs does not conflate the two inquiries.
The circumstances in United States v. Gay, 240 F.3d 1222 (10th Cir.2001), a case highlighted by the dissent, were markedly different from those here. A confidential informant whom officers encountered at the home of the suspect’s uncle stated that the suspect did not live there. Id. at 1225. Unlike the imprecise information about the suspect’s whereabouts offered by Christine, the informant in Gay "knew, from personal experience and numerous visits,” that the suspect lived at a residence two miles away. Id. The informant accompanied officers to that location and told them the suspect was "presently in his home.” Id. Similarly, contrary to the dissent’s assertion, the facts of Hayes do not closely resemble the circumstances here. Among other differences, the officers in Hayes knew where the suspect lived, and his probation officer had told them that the suspect would likely be at the apartment. See 209 Fed.Appx. at 551.

. We note that the record raises some questions about whether Christine in fact reported that Daley was “staying at” 63 Menlo Street. Although Schaaf testified on direct examination at the suppression hearing that the officers had received information that Daley "was staying at 63 Menlo Street,” his affidavit reported that Christine "indicated she had seen [Daley] recently at 63 Menlo Street” (emphasis added). Schaaf backtracked a bit in his testimony on cross-examination, agreeing that the information in the affidavit — i.e., that Christine indicated that she had seen Daley at the house — was "about the sum” of what Christine had said. Fries, meanwhile, testified on direct examination that Christine told the officers that she had "seen [Daley] earlier up at Menlo Street,” and on cross-examination agreed that Christine told the officers *341 that she had "recently seen” Daley there. Given the absence of other evidence, it makes no difference to our analysis whether Christine reported that Daley was "staying” there or had only been seen there.

. Although we agree in this respect with our dissenting colleague, we offer no view on his analysis of the detention issue under Terry.