NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Grafton
No. 2015-0636

THE STATE OF NEW HAMPSHIRE

v.

ROBERT GRIMPSON SMITH

Argued:  November 9, 2016
Opinion Issued:  January 31, 2017

Joseph A. Foster, attorney general (Sean P. Gill, assistant attorney general, on the brief and orally), for the State.

Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

LYNN, J.  Following a jury trial in Superior Court (Bornstein, J.), the defendant, Robert Grimpson Smith, was convicted of possession of heroin.  See RSA 318-B:2, I (2011).  The defendant appeals, arguing that the trial court erred by: (1) denying the defendant's motion to suppress; and (2) excluding the testimony of a defense investigator.[1]  We affirm.

_____

[1] The defendant raised two additional issues in his notice of appeal, but did not address those issues in his brief.  Accordingly, they are deemed waived.  See Mountain View Park, LLC v. Robson, 168 N.H. 117, 121 (2015) ("[A]ny issues raised in the notice of appeal, but not fully briefed, are deemed waived.").

The pertinent facts are as follows. On August 2, 2014, Officer Alden responded to a report that a woman, later identified as Kerry St. Lawrence, had collapsed on the lawn outside 14 Bank Street in Lebanon. When Alden arrived, he saw St. Lawrence sitting bent over on the lawn, approximately six feet from the entrance of the rooming house located at that address. Alden called out to her, but she did not respond. When Alden put his hand on St. Lawrence's shoulder, she slowly lifted her head and looked at him groggily. After St. Lawrence told him that she was having a medical issue, Alden called for the Lebanon fire department.

Two EMTs arrived, as did another police officer, Sergeant Norris. The EMTs assessed St. Lawrence and decided to take her to the hospital. At that time, St. Lawrence began repeatedly yelling for the defendant. The defendant did not respond. Norris asked St. Lawrence where the defendant was. She told Norris that the defendant was in "our apartment" and gave Norris directions to its location in the building. The door to the room St. Lawrence described (room 1) was on the first floor, about ten feet from the rooming house's main door.

Both Alden and Norris were familiar with the house at 14 Bank Street, having previously responded to various complaints at the location. They knew 14 Bank Street to be a rooming house, and testified that the front door was usually wide open. Norris testified that he passes 14 Bank Street on a regular basis because the road is heavily travelled and the police frequently patrol it. Furthermore, he testified that in his eight years on the police force, he had never seen the door closed. Alden described the house as having between eight and ten rooms. Although these rooms were separately numbered and locked, they shared a common hallway, kitchen, and bathroom.

Norris walked up to the rooming house to check on the defendant and make sure that he was okay. Norris walked through the open front door of the rooming house and saw the defendant lying unresponsive on the floor in room 1, the door to which was also open. Norris called for the EMTs to come inside.

Norris followed the EMTs into room 1. After the defendant regained consciousness, he told the EMTs that he and St. Lawrence had used a quarter gram of heroin. As the EMTs were treating the defendant, Norris observed a syringe, a plastic spoon with cotton in the bowl, and a metal spoon. Based upon his past experience, Norris recognized that these items could have been used to prepare and inject heroin. While the defendant and St. Lawrence were waiting to be taken to the hospital, Norris asked if they would consent to a search of room 1. They declined to give consent.

Thereafter, the officers obtained a search warrant, pursuant to which they seized the plastic spoon with cotton, syringe, and metal spoon. The State later charged the defendant with one count of possession of heroin.

In preparation for trial, Sheryl Montague, a defense investigator, interviewed St. Lawrence and wrote an investigation report about the interview. According to Montague, St. Lawrence initially stated that she was "pleading the [Fifth]." In response to Montague's questions, St. Lawrence stated that she had neither been charged nor received a plea deal that required her cooperation in lieu of being charged. St. Lawrence also indicated that she had received a letter from the County Attorney's Office giving her notice to be available for the defendant's upcoming trial. Without further questioning, St. Lawrence added that it was "her apartment, her name on the lease and her items in the apartment." St. Lawrence then repeated that she was "pleading the [Fifth]," and she did not say anything further.

Before trial, the defendant moved to suppress the evidence seized from the room, arguing that it was the fruit of an illegal search of the residence. Following a hearing, at which the State offered testimony from Alden and Norris, the trial court denied the defendant's motion. The court found that the defendant had no reasonable expectation of privacy in the common hallway at 14 Bank Street, the area from which Norris observed the defendant's unconscious body lying in room 1. Alternatively, the court found that the community caretaking exception to the warrant requirement justified Norris's entry. The defendant moved for reconsideration, arguing that the trial court had failed to consider whether the police physically intruded into the defendant's home. The court denied the motion.

During trial, the State moved to exclude testimony by Montague as inadmissible hearsay. The defendant objected, arguing that the statements made by St. Lawrence to Montague were exempt from the rule against hearsay pursuant to New Hampshire Rule of Evidence 804(b)(3) because the statements were against St. Lawrence's penal interest.[2] The trial court granted the State's motion, ruling that the statements were inadmissible hearsay.[3]

---

[2] Before trial, the court conducted a Richards hearing, see State v. Richards, 129 N.H. 669 (1987), regarding St. Lawrence's ability to invoke her privilege against self-incrimination. During the Richards hearing, St. Lawrence, through counsel, stated that she would invoke her privilege against self-incrimination should she be called to testify. The State conceded that St. Lawrence has "self-evident incrimination issues," but it declined to grant St. Lawrence immunity. The Court (MacLeod, J.) concluded that St. Lawrence was properly raising her constitutional privilege against self-incrimination.

[3] In excluding St. Lawrence's statements to Montague, the court explained: "I find that the statements, . . . the mere fact that it was her apartment, that it was her name on the lease and her items in the apartment . . . , are so vague, nonspecific and amorphous, that they do not tend to expose Ms. St. Lawrence at the time she made them to criminal liability so as to make them admissible under [Rule 804(b)(3)]."

Following a two-day trial, the jury found the defendant guilty.  This appeal followed.

II

The defendant first argues that the trial court erred by denying his motion to suppress.  He asserts that Norris's warrantless entry through the front door of the house at 14 Bank Street violated his right to be secure from unreasonable searches under both the State and Federal Constitutions, and that any evidence discovered as a result of that entry should not have been admitted at trial.[4]  See N.H. CONST. pt. I, art. 19; U.S. CONST. amend. IV.

"When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and we review its legal conclusions de novo."  State v. Boyer, 168 N.H. 553, 556 (2016).  Following our standard practice, we first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).

"Our State Constitution protects all people, their papers, their possessions and their homes from unreasonable searches and seizures."  State v. Goss, 150 N.H. 46, 48 (2003) (quotation omitted); see also N.H. CONST. pt. I, art. 19.  "It particularly protects people from unreasonable police entries into their private homes, because of the heightened expectation of privacy given to one's dwelling."  Goss, 150 N.H. at 48 (quotation omitted).  A violation occurs if government agents invade a person's reasonable expectation of privacy.  See State v. Robinson, 158 N.H. 792, 796 (2009).  This is a "twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as reasonable."  Goss, 150 N.H. at 49 (quotations omitted).  "[T]he determination of whether a person has a legitimate expectation of privacy with respect to a certain area must be made on a case-by-case basis, considering the unique facts of each particular situation."  Boyer, 168 N.H. at 558 (brackets and quotation omitted).  "Evidence that is obtained in violation of Part I, Article 19 may be subject to exclusion from evidence in a criminal trial."  Id. at 557 (quotation omitted).

"The search of a home is subject to a particularly stringent warrant requirement because the occupant has a high expectation of privacy."  State v. Tarasuik, 160 N.H. 323, 328 (2010) (quotation omitted).  The protections

---

[4] The defendant does not independently challenge the trial court's conclusion that Norris's entry into room 1 from the main hallway of the building, upon observing the defendant's unresponsive body lying on the floor of the room, was reasonable.  Nor does the defendant dispute the trial court's conclusion that the seized contraband was within Norris's plain view once he entered the room.

4

afforded to a person's home are not limited to single-family dwellings: an apartment can be a home within the meaning of the State Constitution. See, e.g., State v. Chaisson, 125 N.H. 810, 817 (1984) (When officers executed a search warrant at defendant's apartment and an officer remained at the apartment for the purpose of arresting the defendant, that officer's conduct "constituted a search for the defendant within his home." (emphasis added)). Similarly, "we have stated that the privacy interest in a hotel room is comparable to that of the home." Tarasuik, 160 N.H. at 328 (quotation omitted).

Here, the defendant argues that Norris conducted an unconstitutional search when he crossed the threshold of the house at 14 Bank Street, which the trial court characterized as "essentially a boarding house or rooming house." The defendant argues that the common areas in the rooming house, which include hallways, kitchen, and bathroom, should be protected from government intrusion. The State, however, argues that the defendant's protected privacy interest began at the door to room 1 and did not extend to the common hallway.

We have not previously addressed whether a tenant has a reasonable expectation of privacy in the common areas of a rooming house, and other jurisdictions that have addressed the issue have reached varying conclusions. See United States v. Anderson, 533 F.2d 1210, 1214 (D.C. Cir. 1976) (reasoning that "appellant's constitutionally protected privacy interest began at the door to [his room] rather than at the door to the entire rooming house"); Bryant v. United States, 599 A.2d 1107, 1109-10 (D.C. 1991) (reasoning that defendant had a legitimate expectation of privacy in common areas of a rooming house, in part, because there was no evidence that the areas were open to the public); State v. Titus, 707 So. 2d 706, 711 (Fla. 1998) (reasoning that common hallways in rooming houses are protected because they connect individual rooms with bathrooms and kitchens); State v. Kechrid, 822 S.W.2d 552, 554-55 (Mo. Ct. App. 1992) (reasoning that defendant did not have a reasonable expectation of privacy in rooming house common area because the area was "open to anyone having business there"). In arriving at such varying results, courts have focused on the particular facts of the living situation in question. See, e.g., United States v. Werra, 638 F.3d 326 (1st Cir. 2011). The common areas in rooming houses that are more like shared single-family dwellings are usually protected. Id. at 332. Conversely, the common areas in rooming houses that are more like unsecured apartment buildings are not usually protected. Id.

For example, in Werra, the First Circuit noted that, when dealing with a residence that "does not fit squarely into the paradigm for either a traditional family home or a multi-unit apartment building," the court should look to the nature of the tenants' living arrangements. Id. at 332 (quotation omitted). If the tenants "lived separately—like apartment dwellers—they could not claim

5

the common areas of the house, including the foyer, as their private space."
Id.; see also Chaisson, 125 N.H. at 816 ("The common areas of an apartment
building, even if they are normally kept locked, are not places in which tenants
have a reasonable expectation of privacy." (quotation omitted)).  But see United
States v. Carriger, 541 F.2d 545, 548-50 (6th Cir. 1976) (finding a violation of
defendant's Fourth Amendment rights when police, through guile, gained
access to an apartment building's common hallways that could only be
accessed with a key or by a tenant activating a buzzer system).  However, if the
tenants "did not live in individualized residences within the house—and were
thus more like the occupants of a single-family home—their right to privacy . . .
would begin at [the] front door."  Werra, 638 F.3d at 332 (quotation omitted);
see also State v. Crider, 341 A.2d 1, 4 (Me. 1975) ("The mere presence of a
hallway in the interior of a single family dwelling, without more, is not in itself
an invitation to the public to enter . . . .").  The court in Werra went on to hold
that the defendant had a reasonable expectation of privacy in the rooming
house's foyer because the tenants "shared the house in much the same way as
would a traditional family" and "could best be characterized as roommates in
the same house, not simply co-tenants sharing certain common areas."  Werra,
638 F.3d at 334-35 (quotations omitted); see also Reardon v. Wroan, 811 F.2d
1025, 1027 n.2 (7th Cir. 1987) (finding that fraternity members have a "greater
expectation of privacy in the common areas of their residence than do tenants
of an apartment building" because members "could best be characterized as
roommates in the same house, not simply co-tenants sharing certain common
areas" (quotation omitted)).

Turning to the facts of this case, the record reflects that the house at
14 Bank Street has between eight and ten individual rooms, each with an
individually numbered and locked private door.  The tenants all share a
common bathroom and kitchen, which the tenants can access by using a
common hallway.  Additionally, the front door to the building is usually left
unsecured and open, and it leads directly into the common hallway.

The fact that the individual units are not fully self-contained living
spaces (i.e., they do not have separate bathrooms and kitchens), weighs in
favor of finding that the defendant had an objectively reasonable expectation of
privacy in the common hallway of the building.  Bathrooms and kitchens are
integral parts of a home, and the common hallway at 14 Bank Street was the
only means for tenants to access these rooms.  See Titus, 707 So. 2d at 711
(reasoning that "[i]nterior hallways in rooming houses are protected only by
virtue of linking such traditional rooms within the house").

However, several other factors weigh against finding an objectively
reasonable expectation of privacy.  The rooms are individually numbered, and
each is secured by a lock, which is similar to how apartment buildings are
organized.  Cf. Werra, 638 F.3d at 333-35 (reasoning that tenants in a rooming
house could best be characterized as roommates within the same house, in

part, because they shared each other's personal spaces). Additionally, 14 Bank Street has between eight and ten rooms, and the front door is customarily left unsecured and wide open. See United States v. Bain, 155 F. Supp. 3d 107, 116 (D. Mass. 2015) (reasoning that residents of an apartment building with a small number of units (three) and a secured front door may have a "greater expectation of privacy in the interior of the building than would be the case in a larger building without a lock or where the mail and other deliveries were made inside the front door"). The common hallway that Norris entered was accessible to a large number of people: the landlord, between eight and ten tenants, guests of those tenants, and visitors calling upon the individual tenants of those rooms. See id. at 116-17 (finding no reasonable expectation of privacy in the locked entryway and common staircase that connected three apartments because these areas "were shared spaces accessible to the tenants of three apartment units and their guests, the landlord, and the landlord's agents" and "served as passageways routinely used for egress and ingress to the apartment units"); United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (reasoning that a tenant in an apartment had no reasonable expectation of privacy in a common hallway because the hallway was "available for the use of residents and their guests, the landlord and his agents, and others having legitimate reasons to be on the premises").

Although the trial court found that the entryway to 14 Bank Street was usually left unlocked and open, an open door, standing alone, does not destroy a person's privacy rights. See Titus 707 So. 2d at 710 ("The absence of locks or even doors on the entrances does not change the character of the building from a residence." (ellipsis omitted)). Here, however, the facts in the record support an inference that the way the tenants and landlord of 14 Bank Street used the front door demonstrated an implied license for visitors to approach and knock on the individual tenant rooms, rather than wait outside the front door. This custom makes 14 Bank Street more like an unsecured apartment building, where visitors approach through the common hallways and knock directly on individual apartments. See Bain, 155 F. Supp. 3d at 116 ("First Circuit precedent establishes that generally a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building." (quotation omitted)). Additionally, there were no facts that suggested that visitors should knock on the exterior door rather than proceed directly to the room of the person whom they came to visit. Cf. Logan v. Com., 616 S.E.2d 744, 748 (Va. Ct. App. 2005) (finding that the common hallway in a rooming house was not open to the general public when the front entrance had a door, an outer storm door, a "no trespassing" sign on a pole near the steps leading to the door, another "no trespassing" sign on the door, and a sign on the door that advised visitors to "ring" or "knock" to enter).

In sum, the large number of tenants, the fact that each room had an individual number and a private lock, and the custom of leaving the exterior door unsecured and open suggest that the tenants at 14 Bank Street lived

more like apartment dwellers, despite the shared kitchen and bathroom. Based upon these facts, we conclude that the defendant did not have a reasonable expectation of privacy in the common hallway at 14 Bank Street, and, therefore, Norris's entry into the common hallway did not invade the defendant's reasonable expectation of privacy under Part I, Article 19 of the State Constitution. Because we have recognized that the Federal Constitution affords no greater protection as to a defendant's expectation of privacy, see Goss, 150 N.H. at 49, we reach the same conclusion on this issue under the Federal Constitution as we do under the State Constitution.

The defendant next argues that Norris's entry into the common hallway at 14 Bank Street was a trespassory invasion of a constitutionally protected area, and thus an illegal search. In support of his argument, he relies upon the United States Supreme Court's decision in Florida v. Jardines, 133 S. Ct. 1409 (2013). See Jardines, 133 S. Ct. at 1417 (stating that "[t]he Katz reasonable-expectations test has been added to, not substituted for, the traditional property-based understanding of the Fourth Amendment" (quotation and emphases omitted)).

"The United States Supreme Court has recently clarified that, under the Federal Constitution, a criminal defendant may also challenge a search based upon a trespass theory." State v. Mouser, 168 N.H. 19, 23-24 (2015); see also Jardines, 133 S. Ct. at 1414-17. "The trespass theory has three requirements: a physical intrusion, on an enumerated interest ('persons, houses, papers, and effects'), that is not supported by an implicit license based on social norms." Mouser, 168 N.H. at 24 (quotation and brackets omitted).

In Jardines, police brought drug sniffing dogs onto the defendant's porch for the purpose of detecting illegal activity. See Jardines, 133 S. Ct. at 1413. The Jardines Court emphasized that constitutional protection against unreasonable searches is afforded to both the home and the area immediately surrounding and associated with the home, which is referred to as the curtilage. Id. at 1414-15. The Court reasoned that the "background social norms that invite a visitor to the front door do not invite him there to conduct a search." Id. at 1416. Thus, the Court concluded that the government violated the Fourth Amendment because it physically intruded into constitutionally protected curtilage for the sole purpose of conducting a search. Id. at 1416-17 (concluding that the government's "behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do").

Even if we assume, without deciding, that the common hallway at 14 Bank Street was constitutionally protected curtilage of room 1, Norris's entry into the hallway is not the type of unconstitutional physical intrusion that Jardines contemplates.

"We have long adhered to the common law principle that certain property surrounding a home deserves the same protection against unreasonable searches and seizures as the home itself." State v. Smith, 163 N.H. 169, 172 (2012). "Such areas, known as curtilage, were traditionally accorded constitutional protection and required either a warrant or circumstances falling within a recognized exception to the warrant requirement before they could be entered or searched." Id. However, a homeowner or occupant implicitly provides a customary license to visitors, including police officers, to enter the curtilage of his or her home. See State v. Socci, 166 N.H. 464, 469-70 (2014) (recognizing that "[t]his implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave" (quotation omitted)); see also Jardines, 133 S. Ct. at 1414-15 ("The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.").

Unlike the police in Jardines, Norris did not enter the common hallway and approach St. Lawrence's apartment "to do nothing but conduct a search." He entered the hallway to knock on the door to room 1 and inform the defendant that his girlfriend was being taken to the hospital. This is how any other visitor would approach the door to room 1 to initiate a conversation, and Norris had an implied license to do so.

Therefore, we conclude that Norris's entry into the common hallway at 14 Bank Street was not a prohibited physical intrusion under the Federal Constitution. To the extent that the defendant argues that Norris's entry into the common hallway was a prohibited physical intrusion under the State Constitution, he has not argued that the State Constitution provides greater protection than the Federal Constitution. Therefore, we reach the same conclusion on this issue under the State Constitution as we do under the Federal Constitution.

In sum, we conclude under both the State and Federal Constitutions that: (1) the defendant did not have a reasonable expectation of privacy in the common hallway area of 14 Bank Street; and (2) Norris did not unconstitutionally trespass upon the defendant's property interest in his home. Therefore, we hold that the trial court did not err by denying the defendant's motion to suppress.[5]

---

[5] In light of our conclusion that Norris's entry into the common hallway of 14 Bank Street infringed neither the privacy nor the property rights of the defendant, we need not address the defendant's arguments regarding the inapplicability of the community caretaking and consent exceptions to the warrant requirement.

## III

The defendant next argues that the trial court erred by excluding testimony from defense investigator Montague regarding statements made to her by St. Lawrence.

"[W]hether a statement is hearsay or admissible under a hearsay exception is a question for the trial court." State v. Robidoux, 139 N.H. 657, 660 (1995) (quotation and ellipsis omitted). We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard. State v. Noucas, 165 N.H. 146, 158 (2013). "To demonstrate an unsustainable exercise of discretion, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case." State v. Ramsey, 166 N.H. 45, 49 (2014). "In determining whether a ruling is a proper exercise of judicial discretion, we consider whether the record establishes an objective basis sufficient to sustain the discretionary decision made." State v. Costella, 166 N.H. 705, 714 (2014).

The trial court ruled that Montague could not testify regarding St. Lawrence's statements because they constituted inadmissible hearsay. The defendant argues that the statements were admissible under New Hampshire Rule of Evidence 804(b)(3), which creates an exception to the hearsay rule for statements against interest.

Rule 804(b) provides that certain out-of-court statements are not excluded by the hearsay rule if the declarant is unavailable as a witness. See N.H. R. Ev. 804(b). Paragraph (b)(3) of the rule states, in relevant part:

> Statement Against Interest. A statement which . . . at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in this position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

N.H. R. Ev. 804(b)(3). "The rule thus permits an out-of-court statement to be admitted at trial when: (1) the declarant is shown to be unavailable; and (2) the statement is against the declarant's penal interest." State v. Kiewert, 135 N.H. 338, 343 (1992). "If offered by the defendant to exculpate himself, there is an additional requirement that the statement be corroborated by circumstances clearly indicating its trustworthiness." Id. "The justification for this exception to the hearsay rule rests upon the assumption that one does not make statements that would damage oneself unless the [statements are] true." Id. (quotations and brackets omitted).

10

"Rule 804(b)(3) clearly sets forth an objective standard for determining the against-interest nature of the statement." Id. "This standard was adopted for practical reasons; because the initial threshold requirement for the application of the rule is that the declarant be unavailable, there will rarely be evidence of what the declarant thought." Id. at 343-44. "[H]owever, the court is not precluded from making an inquiry into the declarant's subjective state of mind." Id. at 344 (quotation omitted). Therefore, we give due weight to evidence of the declarant's subjective intent. Id.

The statements at issue come from a defense investigator interview with St. Lawrence. During the interview, St. Lawrence initially stated that she was "pleading the [Fifth]." She then added that it was "her apartment, her name on the lease and her items in the apartment." St. Lawrence then repeated that she was "pleading the [Fifth]," and she did not say anything further. Montague conducted the interview outside St. Lawrence's apartment, approximately eleven months after the events leading to the charges against the defendant, and while the defendant was inside the apartment. The trial court excluded St. Lawrence's statements, finding that they were not against her penal interest because they were vague, nonspecific, and amorphous.[6]

If we examine the statements alone, we might agree with the defendant. On August 2, 2014, Lebanon police officers seized a plastic spoon with cotton, a syringe, and a metal spoon from room 1 of the house at 14 Bank Street. The metal spoon was an "item" located within the room, and it had a trace amount of heroin on it. RSA 318-B:2, I, makes it illegal to possess heroin. Thus, standing alone, St. Lawrence's statements that it was "her apartment, her name on the lease and her items in the apartment" arguably could be regarded as an admission that she illegally possessed heroin, thereby tending to subject her to criminal liability. However, the trial court was not required to, and did not, examine the statement in isolation, and we agree with its conclusion that, when examined in the context of all the surrounding circumstances, the statements are too "vague, nonspecific and amorphous" to satisfy the requirements of Rule 804(b)(3).

St. Lawrence's repeated statements that she was invoking her privilege against self-incrimination are evidence of her subjective state of mind. By stating that she was "pleading the [Fifth]," St. Lawrence demonstrated that she may well have believed that she was not incriminating herself, but rather, that by making such a proclamation, she was then free to say anything to save the defendant, her boyfriend, without the State being able to use her statements against her. "If the declarant does not believe the statement to be against [her] interest, the rationale for the exception fails." State v. Woodman, 125 N.H. 381, 384 (1984) (quotation omitted) (reasoning that because the declarant "indicated that he did not believe that his statements were against his penal

---

[6] The State concedes that St. Lawrence was an unavailable witness.

11

interest, it would be anomalous for this court to rule that the statements were declarations against penal interest"); see also Robidoux, 139 N.H. at 661 (reasoning that a declarant's confession was not against his penal interest because the declarant indicated that he did not believe the statements were against his penal interest).

The timing and circumstances surrounding St. Lawrence's statements also indicate that the statements may not be reliable: she made them eleven months after the events in question, to the investigator she knew represented her boyfriend, and during an interview that she knew was about her boyfriend's pending trial. Thus, these were not spontaneous, and therefore reliable, statements, as the defendant argues. See State v. Cook, 135 N.H. 655, 664 (1992) (reasoning that a declarant who speaks spontaneously "presumably does not have sufficient time to contrive a false version of events"). Rather, the timing and circumstances show that St. Lawrence was aware of the subject and purpose of the interview and had time to contrive a false version of events.

Considered together, the circumstances surrounding St. Lawrence's statements, her repeated invocation of the Fifth Amendment, and the vague nature of her statements, provided an objective basis for the trial court to find that the statements were not sufficiently trustworthy to meet the requirements of Rule 804(b)(3), and thus constituted inadmissible hearsay. Therefore, because there was an objective basis to support the trial court's decision to exclude the investigator's testimony, we conclude that the trial court sustainably exercised its discretion in excluding the evidence.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.