NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2019-0371

THE STATE OF NEW HAMPSHIRE

v.

JOHN GATES

Argued: September 24, 2020
Opinion Issued: December 9, 2020

Gordon J. MacDonald, attorney general (Zachary Lee Higham, attorney, on the brief and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. The defendant, John Gates, appeals his convictions for arson, RSA 634:1 (Supp. 2019), attempted arson, two counts of burglary, RSA 635:1 (2016), being a felon in possession of a dangerous weapon, RSA 159:3, I (2014), and use of a Molotov cocktail, RSA 158:37, II (2014). He challenges an order of the Superior Court (Messer, J.) denying his motion to suppress evidence obtained when, without a search warrant, the police entered the vestibule and utility closet of his apartment building located on his family's farm. In the trial court, the defendant argued that the warrantless search violated his rights under Part I, Article 19 of the State Constitution and the Fourth Amendment to the Federal Constitution. The trial court applied the two-part framework established in State v. Goss, 150 N.H. 46, 49 (2003), which

provides that, for a warrantless search to be unlawful, an individual must have a legitimate expectation of privacy — both subjective and objective — in the place searched. The trial court found that the defendant lacked a legitimate expectation of privacy in both the vestibule and the utility closet and concluded that the officers' warrantless entry into those areas was lawful. On appeal, the defendant argues that the trial court erred with respect to both rulings. Because we agree with the defendant that, under Part I, Article 19 of the State Constitution, he had a legitimate expectation of privacy in the utility closet, we reverse and remand.

The following facts are taken from the trial court's order denying the defendant's motion to suppress, are established by the evidence submitted at the suppression hearing, or are otherwise undisputed. On January 17, 2018, at approximately 3:30 a.m., the Kingston Police Department dispatched an officer to the Carriage Town Plaza in Kingston. When that officer arrived on the scene, he observed that the alarm system for one of the buildings in the Carriage Town Plaza was activated and that smoke was emanating from one of the businesses in the Plaza, the Carriage Town Market. A Nor'easter was dropping heavy snow that morning and the officer observed footprints in the snow leading from the Carriage Town Market away from the scene towards nearby Route 125. The officer noticed that the footprints had a distinctive tread mark and were sporadically accompanied by a separate drag mark.

The responding officer was soon joined by a second officer and the two officers followed the footprints as they zig-zagged along and across Route 125 before the officers lost the trail. The second officer eventually relocated the trail of footprints near a farm (hereinafter referred to as "the farm property" or "the property"). He identified the tracks as a continuation of the footprints from the Carriage Town Market based on the matching tread, gait, and sporadic accompanying drag mark.

The officers continued to follow the footprints as they crossed onto the front of the farm property, which is a large plot of land owned and occupied by one extended family. A driveway enters the property from Route 125 and runs past several buildings. The property owner and his wife reside in a house that is close to Route 125. Beyond the house are two greenhouses and a farm stand and behind those buildings is a barn. Finally, beyond the barn, in the "back corner," is the two-story apartment building where the defendant resided.

The apartment building is built into a slope such that the front door faces Route 125 and provides an entrance to the second floor of the building. The back door of the building provides access to the first floor. The apartment building has two units on the first floor and additional units on the second floor. All of the units in the apartment building were rented by members of the owner's family, including the defendant and his mother.

2

The officers followed the footprints onto the farm property, past the house and the greenhouses and farm stand, and then around the barn to a car parked near the rear of the apartment building. They observed three exterior doors, with a shoveled stone walkway leading to the center door. The footprints led from the car towards the building and disappeared at the beginning of the walkway.

At approximately 4:30 a.m., a third officer, who was somewhat familiar with the farm property, arrived at the scene. The officers approached the center exterior door, which had a glass window. The officers looked through the window and observed an illuminated vestibule area with three unmarked doors — one door to the left, one in the center, and one to the right. Finding the exterior door unlocked, the three officers entered the vestibule.

Once inside, the officers observed that the vestibule was barely large enough for the three of them to share the space, and that it contained a coat rack and a shovel leaning against the back wall. The officers knocked on the door to the left and an individual, later identified as the defendant, answered. The officers identified themselves and explained to the defendant that they were investigating a fire that had occurred at the Carriage Town Plaza. The defendant told the officers he was the sole occupant of his apartment and that his elderly mother lived in the apartment across the hall. He also explained that he had recently left his apartment to shovel the walkway. The officers requested that the defendant identify the shoes that he had been wearing when he shoveled the walkway and asked to see them. The defendant replied that he had been wearing sneakers when shoveling. He then allowed the officers to examine a pair of sneakers and a pair of boots. Both pairs were dry.

While two officers continued questioning the defendant, another officer approached the center door, found it unlocked, and opened it to look for a stairwell leading to the second-floor apartments. Using his flashlight to illuminate the dark room, the officer realized that he had entered a utility closet, rather than a stairwell. He took two or three steps into the room and observed that it contained a water heater, oil tanks, and electrical panels. As he turned to exit, the officer noticed a pair of wet boots behind the door to the vestibule. The officer picked up the boots, exited the utility closet, and asked the defendant if the boots belonged to him. The defendant denied owning the boots and insisted that they belonged to a cousin who was not present at the time. The defendant then allowed the officer to seize the boots. The officers later concluded that the tread pattern on the boots matched the footprints in the snow leading from the Carriage Town Market to the apartment building.

A grand jury indicted the defendant on multiple charges arising out of the fire at the Carriage Town Market. Before trial, the defendant moved to suppress all evidence that the officers obtained as a result of their warrantless entry into the vestibule and utility closet. The Trial Court (Anderson, J.) held a

3

two-day evidentiary hearing on the defendant's motion, during which the State called three witnesses — the three officers who entered the vestibule —  and offered no exhibits into evidence.[1]

The Trial Court (Messer, J.) denied the defendant's motion to suppress. With respect to the vestibule, the court found that the defendant had not exhibited a subjective expectation of privacy and, even if he had, any expectation of privacy in the vestibule was not objectively reasonable. Regarding the utility closet, the court concluded that, even if the defendant possessed a subjective expectation of privacy in that location, that expectation was not objectively reasonable.  The trial court denied the defendant's motion to reconsider.  After a seven-day jury trial, the jury found the defendant guilty of all charges.  This appeal followed.

"When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous, and we review its legal conclusions de novo."  State v. Smith, 169 N.H. 602, 607 (2017) (quotation omitted).  Because the defendant did not renew his motion to suppress at trial, "we limit our review to the suppression record upon which the trial court based its decision."  State v. Gonzalez, 143 N.H. 693, 697 (1999).  The defendant cites both the State and the Federal Constitutions in challenging the trial court's denial of his motion to suppress. Following our standard practice, we first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).

Part I, Article 19 of the State Constitution provides, in relevant part, that "[e]very subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions."  N.H. CONST. pt. I, art. 19.  "Evidence that is obtained in violation of Part I, Article

---

[1] At the hearing, defense counsel questioned the State's witnesses about several photographs of the exterior and interior of the apartment building.  The trial court relied on at least two of these photographs in its order denying the motion to suppress.  The defendant has not, however, included any of the photographs discussed at the hearing in the record on appeal.  See Sup. Ct. R. 13(2) (requiring the moving party to provide a sufficient record for the court to decide the issues raised on appeal).  Nevertheless, the defendant has provided us with a sufficient record to decide the issues raised on appeal.  The trial court's order and the transcript of the suppression hearing provide adequate factual detail about the farm property and the apartment building.  Importantly, on appeal, neither party challenges the trial court's factual findings.  In addition, the trial court's order explains the reasoning for its legal conclusions, which we review de novo.  See State v. Smith, 169 N.H. 602, 607 (2017); cf. State v. Bergmann, 135 N.H. 97, 99-100 (1991) (holding that record on appeal was insufficient to determine whether trial court abused its discretion in denying motion to dismiss in part because the record did not include the basis for the trial court's decision).

19 may be subject to exclusion from evidence in a criminal trial." State v. Boyer, 168 N.H. 553, 557 (2016) (quotation omitted).

"When determining whether a warrantless search may give rise to a violation of the State Constitution, we apply an expectation of privacy analysis." State v. Bazinet, 170 N.H. 680, 684 (2018) (quotation omitted). Without an invasion of the defendant's legitimate expectation of privacy, there has been no violation of the defendant's rights under Part I, Article 19. Id. To determine whether the defendant had a legitimate expectation of privacy, we engage in a two-part analysis. See Smith, 169 N.H. at 607. First, we consider whether the defendant exhibited a subjective expectation of privacy and, second, whether that expectation is "one that society is prepared to recognize as reasonable." Id. (quotation omitted); see also Goss, 150 N.H. at 48-49. "Whether society will recognize a particular individual's expectation of privacy as reasonable does not turn on whether a hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate based upon our societal understanding regarding what deserves protection from government invasion." Boyer, 168 N.H. at 558 (quotations and brackets omitted).

Our State Constitution "particularly protects people from unreasonable police entries into their private homes, because of the heightened expectation of privacy given to one's dwelling." Goss, 150 N.H. at 48 (quotation omitted); see also Boyer, 168 N.H. at 558 ("The protections provided by Part I, Article 19 are never in sharper focus than when viewed in the protection of one's dwelling." (quotation and brackets omitted)). "The protections afforded to a person's home are not limited to single-family dwellings: an apartment can be a home within the meaning of the State Constitution." Smith, 169 N.H. at 608.

When deciding whether an individual may claim a legitimate expectation of privacy in a particular place, no single factor is determinative. Boyer, 168 N.H. at 558. Rather, the determination "must be made on a case-by-case basis, considering the unique facts of each particular situation." Smith, 169 N.H. at 607 (quotation omitted). In conducting this fact-intensive analysis, we do not view the facts from the perspective of the officers involved or from that of the hypothetical "reasonable officer" often referred to in search and seizure cases. See 6 Wayne R. LaFave, Search and Seizure: A Treatise on The Fourth Amendment § 11.3, at 162 (5th ed. 2012). Instead, we view the facts from "the omniscient perspective — what a judge considering a motion to suppress knows, ex post reality." Id. (quotation omitted); see also Smith, 169 N.H. at 605, 609-11 (considering facts beyond those known by officers in determining whether rooming house tenant had a legitimate expectation of privacy).

At oral argument, the parties agreed that the State bore the burden of proof at the suppression hearing to show, by a preponderance of evidence, that

the search was lawful.  We proceed on the assumption that the State bore the burden of proof at the suppression hearing.

As a threshold matter, the State argues that the defendant's appeal must fail because the motion to suppress filed in the trial court lacked sufficient factual detail and was not supported by a separate verified affidavit as required by court rules.  See N.H. R. Crim. P. 15(b)(2)(C).  However, because the State did not raise this argument in the trial court, it is not preserved, and we decline to address it.  See State v. Willis, 165 N.H. 206, 223 (2013).

The defendant's argument on appeal has two parts.  First, he argues that the trial court erred when it ruled that the officers' warrantless entry into the vestibule of his apartment building was lawful because he lacked a subjective and objective expectation of privacy in that area.  Second, he argues that, even if the trial court properly found that he had no legitimate expectation of privacy in the vestibule, it erred when it concluded that he lacked a legitimate expectation of privacy in the utility closet.  Although on appeal the parties have focused on the defendant's arguments as they relate to the boots seized from the utility closet, the motion to suppress filed in the trial court was broader in scope.  The motion sought to suppress "all evidence obtained as a result of the illegal search" of the utility closet. (Emphasis added.)  At the hearing on the motion, defense counsel expanded the scope of the motion by arguing that the officers' entry into the vestibule was itself an illegal search.  Consequently, the trial court addressed the lawfulness of the officers' entry into both the vestibule and the utility closet.  We will do the same.  Although our conclusion with respect to the utility closet — that the defendant had a legitimate expectation of privacy — is dispositive as to the admissibility of the boots, we analyze the defendant's expectation of privacy in both the vestibule and the utility closet to address the admissibility of any other evidence the officers obtained as a result of the warrantless search.

The defendant first argues that the facts that support the conclusion that he had a subjective expectation of privacy in the vestibule also support the conclusion that the expectation of privacy is one that society is prepared to recognize as reasonable: the apartment building was occupied only by family members; the building was located on a family-owned farm and isolated from other residential properties; the building contained a small number of units; the doors inside the vestibule were unmarked; the vestibule contained a coat rack and shovel; and the exterior door was closed.  Because, as explained below, we conclude that the defendant's expectation of privacy with respect to the vestibule was one that society is not willing to recognize as reasonable, we need not assess whether the defendant exhibited a subjective expectation of privacy in regard to the vestibule.

We have not directly addressed the question of whether a tenant has an objectively reasonable expectation of privacy in common areas of an apartment

6

building.  We did, however, address a similar issue in State v. Smith: whether a tenant has a reasonable expectation of privacy in common areas of a rooming house.  Smith, 169 N.H. at 608-11.  In Smith, we canvassed the law of other jurisdictions and observed that generally "[t]he common areas in rooming houses that are more like shared single-family dwellings are usually protected" while "the common areas in rooming houses that are more like unsecured apartment buildings are not usually protected."  Id. at 608-09.  With these generalizations in mind, in Smith we noted that the rooming house at issue had eight to ten individually numbered and locked rooms, that the tenants shared a common bathroom and kitchen connected by a common hallway, and that the exterior door was customarily left unsecured and open, giving visitors an implied license to enter the building and knock on individual tenants' doors.  Id. at 609-10.  We concluded that these facts made the rooming house more like an "unsecured apartment building," id. at 610, and the tenants "more like apartment dwellers," id. at 611.  Therefore, we held that the defendant did not have an objectively reasonable expectation of privacy in the common hallway of the rooming house.  Id.

Our holding in Smith suggests that, in general, tenants do not have a reasonable expectation of privacy in common areas of apartment buildings.  See id. at 610-11; see also State v. Mouser, 168 N.H. 19, 25 (2015) (holding that parking area behind defendant's multi-family residence was not part of the curtilage in part because the parking area "was available for the shared benefit" of the residents (quotation omitted)); State v. Chaisson, 125 N.H. 810, 816 (1984) (stating in dicta that "common areas of an apartment building . . . are not places in which tenants have a reasonable expectation of privacy" (quotation omitted)).  This general rule is in accord with the reasoning employed by the majority of jurisdictions that have addressed the issue.  See, e.g., United States v. Maestas, 639 F.3d 1032, 1038 (10th Cir. 2011) ("[M]ost circuit courts have found that 'shared' or 'common' areas in apartment complexes or multi-unit dwellings, such as hallways, entryways, and basements, are not areas over which an individual tenant can have a reasonable expectation of privacy."); State v. Nguyen, 841 N.W.2d 676, 680-81 (N.D. 2013) (noting that majority rule among state courts addressing the issue is that tenants lack a reasonable expectation of privacy in common areas).  The logic behind this approach is that apartment tenants "'have little control over [common] areas, which are available for use of other tenants, friends and visitors of other tenants, the landlord, delivery people, repair workers, sales people, postal carriers and the like.'"  Maestas, 639 F.3d at 1038 (quoting United States v. Miravalles, 280 F.3d 1328, 1332 (11th Cir. 2002)).

We cannot, however, apply this principle as a bright line rule because whether a person has a legitimate expectation of privacy in a particular place "must be made on a case-by-case basis, considering the unique facts of each particular situation."  Smith, 169 N.H. at 607 (quotation omitted).

Turning to the facts of this case, several facts weigh against recognizing that the defendant had an objectively reasonable expectation of privacy in the vestibule. First, the building in this case housed fully self-contained apartments and, therefore, the vestibule did not serve as a passageway between a shared bathroom or kitchen like the common hallway in Smith. Cf. id. at 609-10. Next, although distant from the road, the apartment building was accessible via a driveway and the vestibule was directly accessible from a walkway leading to the exterior door. We have held that "when there is an access route on the property, such as a driveway or a sidewalk, members of the public have an 'implied invitation' to use it" and, therefore, "a person has no reasonable expectation of privacy in access routes." State v. Orde, 161 N.H. 260, 266 (2010). It follows that "when the police come on to private property to conduct an investigation . . . and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." Id. (quotation omitted).

Here, the driveway and the walkway led from Route 125 to the vestibule door. There is no evidence in the record that there were gates or "no trespassing" signs posted along the driveway or walkway. Once at the door, the officers could see into the vestibule — with no special equipment or manipulation — because the door contained a glass window and, even at 4:30 in the morning, the inside light was on. Thus, the officers, with an implied invitation to use the access routes leading to the door at the rear of the building, were in position to view the interior of the vestibule. It is not reasonable to expect privacy in a place that any member of the public can view from an access route. See Smith, 169 N.H. at 610-11.

It is of no consequence in this case that the officers strayed from the driveway itself to follow the footprints before using the walkway to reach the vestibule door. Had the officers obtained the disputed evidence as a result of their deviation from the route across the property, or after looking through windows or doors to which no access route led, we would have a very different case. Cf. Orde, 161 N.H. at 266-67 (holding defendant had objectively reasonable expectation of privacy in deck as part of his curtilage where the officer's "departure from the obvious paths on the property and entrance onto the defendant's deck exceeded his implied invitation onto the property"). But, here, the officers — and any member of the public — could observe the interior of the vestibule by walking up the driveway and following the walkway to the exterior door. This weighs heavily against finding an objectively reasonable expectation of privacy in the vestibule.

In addition, the characteristics and apparent use of the vestibule weigh against recognizing an objectively reasonable expectation of privacy. The vestibule served as the only point of ingress and egress for the first-floor apartments. Consequently, anyone visiting those apartments or accessing the

utility closet — the owner of the farm, his agents, friends or family of the defendant or his mother, or solicitors — would necessarily pass through the vestibule.  Further, the defendant "had no right to exclude [such persons] from the common hallway, and there is no indication that he ever tried to do so." United States v. Holland, 755 F.2d 253, 256 (2d Cir. 1985); see also United States v. Bain, 155 F. Supp. 3d 107, 116-17 (D. Mass. 2015) (finding fact that apartment building entryway, staircase, and second-floor landing "served as passageways routinely used for egress and ingress" weighed against finding legitimate expectation of privacy).

Finally, the fact that the vestibule door was unlocked weighs against recognizing an objectively reasonable expectation of privacy.  This fact further supports the conclusion that the defendant had no right to, and did not try to, prevent others from entering the common vestibule.  In other words, the defendant lacked control over this common area.  See United States v. Acosta, 965 F.2d 1248, 1252 (3d Cir. 1992) (finding no legitimate expectation of privacy in common hallway where defendant "had no way to exclude anyone" because door to hallway was unlocked and therefore common area was "easily accessible to tenants, visitors, solicitors, workmen and other members of the public").

Relying on State v. Titus, 707 So. 2d 706 (Fla. 1998), the defendant argues that we should not "attribute great weight to the fact that the exterior door was unlocked."  In Titus, the Florida Supreme Court held that tenants have a legitimate expectation of privacy in common areas of rooming houses. Titus, 707 So. 2d at 708.  Titus, however, involved a rooming house that operated more like a single-family dwelling than an apartment building.  Id. at 711.  And the Florida Supreme Court expressly stated that its holding in Titus did not extend to "common hallways in unlocked apartment buildings, which generally serve only to connect separate, self-contained living units."  Id. Therefore, the defendant's reliance on Titus is misplaced.  While an open or unlocked door standing alone may not negate a person's privacy rights, see Smith, 169 N.H. at 610, the unlocked exterior door, viewed in the context of the facts discussed above, weighs against recognizing an objectively reasonable expectation of privacy in the vestibule.

On the other hand, there are a number of facts that weigh in favor of recognizing an objectively reasonable expectation of privacy.  The small number of units in the defendant's apartment building is one such fact.  Although, as described above, a majority of courts have held that a tenant in an apartment building has no reasonable expectation of privacy in common areas, a minority of courts have taken a more nuanced approach by recognizing that individuals who live in apartment buildings with relatively few units enjoy a greater expectation of privacy in common areas than individuals who live in larger buildings with many units.  See United States v. King, 227 F.3d 732, 749-50 (6th Cir. 2000) (holding that defendant had an objectively reasonable

9

expectation of privacy in basement of duplex because access to that area was "limited to the duplex's tenants and landlord"); United States v. Fluker, 543 F.2d 709, 712, 716 (9th Cir. 1976) (holding that defendant had objectively reasonable expectation of privacy in corridor between exterior basement door and apartment door in part because building contained only two apartments on basement level and one on upper floor); People v. Killebrew, 256 N.W.2d 581, 583 (Mich. Ct. App. 1977) (holding that tenants enjoyed a "high degree of privacy" in common hallway because it was shared by only two apartments). These courts reason that tenants in buildings with fewer units have a greater expectation of privacy in common areas because access to those areas is limited to fewer people, giving the tenants more control over those common areas. See, e.g., King, 227 F.3d at 745-46, 749-50; Fluker, 543 F.2d at 716; cf. Miravalles, 280 F.3d at 1332 ("The more units in the apartment building, the larger the number of tenants and visitors, workers, delivery people, and others who will have regular access to the common areas, and the less reasonable any expectation of privacy.").

Here, although the record is unclear as to the total number of units in the building, the vestibule provides access only to the two first-floor apartments. Each floor has an entrance, and there was no evidence that the two floors are connected by a stairwell. Therefore, the vestibule was a "common" area only for the two first-floor apartments. Cf. Smith, 169 N.H. at 611 (finding no reasonable expectation of privacy in common hallway of rooming house in part based on "large number of tenants"). In addition, the other tenant sharing the common vestibule was the defendant's mother — not a stranger. See King, 227 F.3d at 748-50 (finding that defendant had an objectively reasonable expectation of privacy in common area of duplex in part because both units in duplex were occupied by members of his immediate family).

In addition, the secluded location of the apartment building in the "back corner" of a large, family-owned piece of property also weighs in favor of finding that the defendant had an objectively reasonable expectation of privacy in the common vestibule. The majority rule discussed above — that tenants do not have a reasonable expectation of privacy in the common areas of an apartment building — depends on the assumption that common hallways or entryways are available for use by "other tenants, friends and visitors of other tenants, the landlord, delivery people, repair workers, sales people, postal carriers and the like." Maestas, 639 F.3d at 1038 (quotation omitted). But, in this case, the apartment building's remote location weakens that assumption — at least with respect to delivery people, sales people, and postal carriers. The building is removed from the road, diminishing the likelihood that sales people or other uninvited members of the public would visit. Cf. Smith, 169 N.H. at 605, 611 (finding no objectively reasonable expectation of privacy in common hallway of rooming house located on "heavily travelled" road that the "police frequently patrol[led]"). And, although there was evidence that the apartment building

had a separate address, the State adduced no evidence at the suppression hearing demonstrating that the mail or other deliveries were made to the interior of the vestibule. See United States v. Drummond, 98 F. Supp. 2d 44, 46, 49-50 (D.D.C. 2000) (finding legitimate expectation of privacy in entryway where tenants' mailboxes were located outside exterior entryway door). Finally, the fact that the doors inside the vestibule were unmarked weighs slightly in the defendant's favor. Cf. Smith, 169 N.H. at 610 (finding that fact that rooms in rooming house were individually numbered and locked weighed against finding objectively reasonable expectation of privacy in hallway).

On balance, considering all of the facts discussed above, we conclude that the defendant did not have an objectively reasonable expectation of privacy in the vestibule. Therefore, the officers' warrantless entry into the vestibule did not violate the defendant's rights under Part I, Article 19 of the State Constitution. Because we have recognized that the Federal Constitution affords no greater protection as to a defendant's expectation of privacy, see Goss, 150 N.H. at 49, we reach the same conclusion on this issue under the Federal Constitution as we do under the State Constitution.

We now address the defendant's second argument: that the trial court erred when it found that the defendant lacked a legitimate expectation of privacy in the utility closet. Turning first to whether the defendant exhibited a subjective expectation of privacy in the utility closet, the defendant argues that he exhibited such an expectation by placing the boots inside the closet and closing the door. The State argues to the contrary, relying on the facts that the closet was unlocked and unmarked, no signs designated it as a private space, the defendant made no attempt to exclude others from the closet, and the defendant disavowed any ownership interest in the boots. We agree with the defendant.

The relevant inquiry with respect to the defendant's subjective expectation of privacy is whether he was "'seeking to preserve as private' the evidence at issue." United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009) (quoting Katz v. United States, 389 U.S. 347, 351 (1967)) (brackets omitted). The defendant meets this standard. His decision to store the potentially incriminating boots behind the closed door of the utility closet — out of sight and not within his own apartment — evidences his intent to keep them private, thereby demonstrating his subjective expectation of privacy in the utility closet. See Rheault, 561 F.3d at 57, 59, 61 (ruling that defendant exhibited subjective expectation of privacy by hiding gun and drugs inside washing machine on landing of different floor of apartment building but concluding defendant's expectation of privacy was not objectively reasonable); King, 227 F.3d at 744, 749-50 (holding that defendant exhibited subjective expectation of privacy in basement of duplex by hiding cocaine there and that expectation was objectively reasonable because basement was accessed by only landlord and defendant's family members who occupied duplex).

11

We are not persuaded by the State's argument that, because the defendant disavowed ownership of the boots when he spoke with the officers standing in the vestibule, he did not exhibit a subjective expectation of privacy in the utility closet. In State v. Sodoyer, 156 N.H. 84 (2007), we identified, but did not reach, the question of whether a defendant's denial of "a possessory interest automatically leads to a waiver of privacy rights in the place being searched," id. at 87. We observed that courts are split on this issue. See id.; compare State v. Ross, 49 S.W.3d 833, 841 (Tenn. 2001) ("[W]hen one disclaims interest in the premises or possessions searched or in the articles seized he cannot question the legality of the search and seizure." (quotation omitted)), with United States v. Vega, 221 F.3d 789, 797 (5th Cir. 2000) (rejecting government's argument that defendant lost right to challenge search by denying he resided on premises because defendant's Fourth Amendment rights did not "evaporate[] simply because he failed to make incriminating admissions in response to police questioning"), abrogated on other grounds as recognized in United States v. Aguirre, 664 F.3d 606, 611 n.13 (5th Cir. 2011).

We agree with those courts that have held that the mere disclaimer of a property interest made in response to police questioning does not negate a defendant's privacy interest in the place or thing searched or seized. See Sodoyer, 156 N.H. at 87 (collecting cases); LaFave, supra § 11.3(a) at 179 (describing this as the "better view"). As we recognized in Sodoyer, "[o]ur constitutional system does not demand that a defendant surrender information that could incriminate him in order to avail himself of another constitutional right." Sodoyer, 156 N.H. at 87; see also Opinion of the Justices, 121 N.H. 531, 540 (1981) ("To require a person to surrender one constitutional right in order to gain the benefit of another is simply intolerable."). Under the State's view, that is precisely what the defendant would have had to do: incriminate himself to preserve his right to challenge the search or disclaim ownership and forfeit the right to later challenge the warrantless search. This rule would be especially unfair in this case, where a central thrust of the State's theory at trial was that the boots did, in fact, belong to the defendant. See United States v. Issacs, 708 F.2d 1365, 1368 (9th Cir. 1983) (observing that defendant's "denial of ownership should not defeat his legitimate expectation of privacy in the space invaded and thus his right to contest the lawfulness of the search when the government at trial calls upon the jury to reject that denial"). We therefore conclude that the defendant did not forfeit his subjective expectation of privacy in the utility closet when he disavowed ownership of the boots. We further conclude that, despite his disavowal of ownership of the boots, the defendant exhibited a subjective expectation of privacy in the utility closet when he stored the boots there. See Rheault, 561 F.3d at 57, 59; King, 227 F.3d at 744.

We turn next to the objective prong of our inquiry. In arguing that he had an objectively reasonable expectation of privacy in the utility closet, the defendant relies on the same facts that he relied upon with respect to the

12

vestibule, and the additional fact that the function of the closet as storage for utility equipment made it even less likely that the uninvited public would enter that space. The State counters that any expectation of privacy in the utility closet was not objectively reasonable because the closet was not locked, the defendant did not exercise control over the closet or exclude others from it, and the closet was accessible to other tenants and the owner of the property. We are not persuaded by the State's argument.

Given that we previously have concluded that the defendant lacked an objectively reasonable expectation of privacy in the vestibule, the critical question is whether the facts relative to the utility closet are sufficiently different to warrant a different result. We conclude that they are. Several of the key facts that weighed against recognizing an objectively reasonable expectation of privacy in the vestibule do not hold true with respect to the utility closet. Importantly, unlike the vestibule, the interior of which could be viewed from the access route leading to the exterior door, the interior of the utility closet was not observable from outside the apartment building. Indeed, its contents were not observable from the interior of the vestibule because the utility closet door had no windows and was closed. See Drummond, 98 F. Supp. 2d at 46, 53 (finding defendant had objectively reasonable expectation of privacy in entryway to duplex where outer door to entryway was opaque with no windows).

Also critical, the purpose and use of the utility closet were materially different. Unlike the vestibule, the utility closet was isolated from regular foot traffic. It would likely be entered by the tenants, the owner of the farm, and workers who needed access to the equipment inside — but not visitors, solicitors, or the general public — and such access would be infrequent compared to passage through the vestibule. Because the utility closet was less accessible than the vestibule — and likely not accessed as often — it is reasonable for society to recognize an expectation of privacy in the utility closet. See United States v. McCaster, 193 F.3d 930, 934-35 (8th Cir. 1999) (Heaney, J., concurring in part and dissenting in part) (expressing view that majority should have recognized objectively reasonable expectation of privacy in a duplex's common closet because it "likely would not be accessed by anyone other than the tenants and landlady" and would not "be accessed as frequently as a hallway or basement"); Fixel v. Wainwright, 492 F.2d 480, 484 (5th Cir. 1974) (finding legitimate expectation of privacy in fenced backyard of four-unit apartment building and contrasting yard with a "common passageway" used by tenants and solicitors to access apartments).

Further, most of the facts that weigh in favor of recognizing an objectively reasonable expectation of privacy in the vestibule apply equally to the utility closet. As explained above, the fact that only two apartments were accessible from the first floor heightens the defendant's reasonable expectation of privacy in the closet because access to the closet was limited, thereby giving the

13

defendant more control over that common space.  See, e.g., King, 227 F.3d at 749-50.  The defendant's ability to control the closet is further enhanced here given that the defendant's mother inhabited the only other apartment with direct access to the closet.  See id. at 750.  Our reasoning is further bolstered by the fact that the apartment building's remote location diminishes the likelihood that uninvited members of the public would have occasion to reach and enter the utility closet.  Additionally, the record contains evidence that the defendant exercised control over the utility closet by using it as storage space for his boots.

We note that the door to the utility closet was not marked "private," nor was it locked.  We cannot conclude, however, that these facts outweigh the factors that support the recognition of the defendant's objectively reasonable expectation of privacy in the utility closet.  Accordingly, we conclude that the defendant exhibited a subjective expectation of privacy in the utility closet, and that his expectation is one that society is prepared to recognize as reasonable.

Because the defendant had a legitimate expectation of privacy in the utility closet, the officers needed a warrant or a valid exception to the warrant requirement to lawfully enter it.  See State v. Gay, 169 N.H. 232, 240 (2016) ("[W]arrantless entries are per se unreasonable and illegal unless they fall within the narrow confines of a judicially crafted exception to the warrant requirement.").  Notably, the State does not make an alternative argument that, even if the defendant had a legitimate expectation of privacy in the utility closet, the warrantless search was nevertheless justified under an exception to the warrant requirement.  Therefore, the officer's warrantless entry into the utility closet was unlawful and all evidence obtained therefrom should have been suppressed.  See Orde, 161 N.H. at 267.  Because we reverse under the State Constitution, we need not reach the defendant's challenge under the Federal Constitution.  See Ball, 124 N.H. at 237.

Reversed and remanded.


HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.

14